UNITED STATES of America,
Appellee,

v.

Russell Eugene WESTON,
Jr., Appellant.

No. 01–3027.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 16, 2001.

Decided July 27, 2001.

Gregory L. Poe, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was A. J. Kramer, Federal Public Defender.

David B. Goodhand, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney at the time the brief was filed, John R. Fisher and Ronald L. Walutes, Jr., Assistant U.S. Attorneys.

Before: SENTELLE, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Concurring opinion filed by Circuit Judge RANDOLPH, with whom Circuit Judge SENTELLE joins.

Concurring opinion filed by Circuit Judge ROGERS.

RANDOLPH, Circuit Judge:

Under the Fifth Amendment's Due Process Clause there is a "significant liberty interest in avoiding the unwanted adminis-tration of antipsychotic drugs." *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). This appeal requires us to decide whether the government may administer such drugs to a pretrial detainee against his will in order to render him competent to stand trial.

## I.

On July 24, 1998, an assailant armed with a .38 caliber revolver forced his way past security checkpoints at the United States Capitol. He shot and killed Jacob Chestnut and John Gibson, both officers of the United States Capitol Police. He shot and seriously wounded Douglas McMillan, also an officer of the United States Capitol Police. Russell Eugene Weston, himself seriously wounded by gunfire, was arrested at the scene. The federal government indicted Weston on two counts of murdering a federal law enforcement officer, one count of attempting to murder a federal law enforcement officer, and three counts of using a firearm in a crime of violence.

The government wants to try Weston for these crimes but is presently unable to do so because the district court found him incompetent to stand trial. *See United States v. Weston,* 134 F.Supp.2d 115, 117 (D.D.C.2001); 1 Joint Appendix 45–46 (competency order). The district court accepted the conclusion of a court-appointed forensic psychiatrist that Weston suffers from paranoid schizophrenia, and that the severity of his symptoms renders him incapable of understanding the proceedings against him and assisting in his defense, as required to bring a defendant to trial. *See* 18 U.S.C. § 4241(a) (statutory competence requirement); *see also Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (constitutional competence requirement). The court committed Weston to the custody of the Attorney General "for treatment in a suitable facili-

ty for a reasonable period of time." 1 Joint Appendix 46; *see also* 18 U.S.C. § 4241(d).

Weston is currently incarcerated "for treatment" at the Federal Correctional Institute in Butner, North Carolina. He is not being treated. Rather, he was placed in solitary confinement under constant observation when he arrived at FCI Butner and remains there today. The Bureau of Prisons apparently placed him in seclusion to "mitigate [his] dangerousness." *Weston*, 134 F.Supp.2d at 130. As an Assistant Director of the Bureau explained, Weston's "mental health seclusion status" is "for very vulnerable inmates, and [is] typically ... reserved for those who present a substantial danger to themselves or somebody else...." 7/24/00 a.m. Tr. at 59. The district court characterized Weston's confinement situation as "simply the warehousing of Weston in a psychotic state. It is not treatment; at best it contains dangerousness." 134 F.Supp.2d at 130–31; *see also* 4 Joint Appendix 103 (Report of court-appointed expert that "the field places severe limitations on the use of seclusion in clinical psychiatry because [it] is considered to be inherently aversive when used for prolonged periods of time.").

There is treatment available for Weston's illness and its symptoms in the form of antipsychotic medication. The parties agree that such medication is likely the only treatment that can mitigate his schizophrenia and attendant delusions, and thus restore his competence to stand trial. *See* Brief for Appellant at 5; Brief for Appellee at 12–13. Weston is not currently receiving any such medication because, at a time when he was considered medically competent to make a determination, he refused them. The district court prohibited the Bureau of Prisons from forcibly medicating Weston without a court order.

After two administrative hearings and two district court hearings, the government obtained an order authorizing it to administer antipsychotic medication against Weston's will. *See United States v. Weston*, 69 F.Supp.2d 99 (D.D.C.1999). The district court held that forcible medication was "medically appropriate" and "essential for [Weston's] own safety or the safety of others." *Id.* at 118. It also found that "the government has a fundamental interest in bringing the defendant to trial," but determined that the dangerousness holding made it unnecessary to decide whether that interest outweighed Weston's right to refuse antipsychotic medication. *See id.* at 118–19. The court declined to consider Weston's claim that forced medication would interfere with his right to a fair trial, holding it was not ripe. *See id.* at 107.

A panel of this court reversed and remanded the case to the district court, holding that the district court's dangerousness finding was not supported by the record. *See United States v. Weston*, 206 F.3d 9 (D.C.Cir.2000) (per curiam). The panel also reversed the district court's determination that Weston's Sixth Amendment right to a fair trial claim was not ripe, holding that "because antipsychotic medication may affect the defendant's ability to assist in his defense, postmedication review may come too late to prevent impairment of his Sixth Amendment right." *Id.* at 14 (citations omitted). The panel also directed the district court to consider Weston's argument that medical ethics preclude forcibly medicating a defendant to make him competent for trial in a case that might carry the death penalty. *See id.* at 14 n. 3.

On remand, the district court again held that the Bureau of Prisons could forcibly medicate Weston. It concluded that antipsychotic medication was medically appro-

priate and "essential to control and treat Weston's dangerousness to others." *Weston*, 134 F.Supp.2d at 127, 131. The district court also held that the "government has an essential interest in bringing Weston to trial" given "the serious and violent nature of the charges, that the immediate victims were federal law enforcement officers performing their official duties, and that the killings took place inside the U.S. Capitol amid a crowd of innocent bystanders." *Id.* at 132. The court concluded that forcible medication would not interfere with Weston's right to a fair trial, and could in some respects enhance his ability to exercise that right by improving his mental function. *See id.* at 132–38.

In this appeal, Weston claims that administering antipsychotic drugs against his will violates his Fifth Amendment due process liberty interest "in avoiding unwanted bodily intrusion" and implicates his right to a fair trial. *See* Brief for Appellant at 37–38. In earlier stages of this case, Weston asserted a First Amendment right to freedom from compulsory medication and challenged the Bureau of Prisons' administrative procedures under the Fifth Amendment's Due Process Clause.[1] He has not raised either issue here so we do not consider them. We affirm the district court's conclusion that the government's interest in administering antipsychotic drugs to make Weston competent for trial overrides his liberty interest, and that restoring his competence in such manner does not necessarily violate his right to a fair trial.

## II.

▇▇▇ The due process liberty interest in avoiding unwanted antipsychotic medication may be "significant," but it is not absolute. *See Kansas v. Hendricks*, 521

U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *United States v. Salerno*, 481 U.S. 739, 750–51, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Washington v. Harper* and later in *Riggins v. Nevada*, the Supreme Court recognized that the government may, under certain circumstances, forcibly administer antipsychotic medication to a prisoner or criminal defendant despite his liberty interest, provided such medication is "medically appropriate." *See Riggins v. Nevada*, 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992); *Washington v. Harper*, 494 U.S. 210, 220, 222–23 & n. 8, 226–27, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). With respect to Weston, there is no doubt that this latter condition has been met.

Whether a proposed course of action is "medically appropriate" obviously depends on the judgment of medical professionals. *See Harper*, 494 U.S. at 231, 233–34, 110 S.Ct. 1028; *Youngberg*, 457 U.S. at 322–23, 102 S.Ct. 2452; *Vitek v. Jones*, 445 U.S. 480, 495, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Parham v. J.R.*, 442 U.S. 584, 606–07, 609, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Addington v. Texas*, 441 U.S. 418, 429, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The district court relied on several experts in concluding that "[a]ntipsychotic medication is the medically acceptable and indicated treatment for Weston's illness." *Weston*, 134 F.Supp.2d at 122.

The district court measured the medical appropriateness of antipsychotic medication by examining the capacity of antipsychotic drugs to alleviate Weston's schizophrenia (the medical benefits) against their capacity to produce harm

---

1. Weston refers in footnote 9 of his brief to the First Amendment, the Fourth Amendment, and "privacy interests" not attributed to any particular part of the Constitution. He has supplied no supporting arguments and we therefore will disregard his references. *See, e.g., Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C.Cir.1997).

(the medical costs, or side effects). *See id.* at 123. Numerous experts testified that antipsychotic medication is the medically appropriate treatment for Weston's illness.[2] While there are potential side effects,[3] the professional judgment of the medical experts was that "each of these potential side effects is generally manageable." *Id.* at 123, 125. The short of the matter is that the record leaves no basis for doubting the district court's conclusion that antipsychotic medication is the medically appropriate treatment for Weston's condition.

Weston claims that the ethical obligations a doctor owes a patient preclude forcible medication in these circumstances. As he sees it, "the question whether the administration of antipsychotic medication is medically appropriate is different from the question whether treatment is therapeutically appropriate." Brief for Appellant at 18. Thus, "[t]he context in which the forced medication issue arises and the state purpose are relevant considerations for the physician to decide whether it is ethical to force-medicate." *Id.* If the state's purpose is to make one competent for trial, Weston argues, then a doctor must consider alternatives such as civil commitment. *See id.* These ethical norms purportedly derive from the Hippocratic Oath and the 1982 United Nations Principles of Medical Ethics Relevant to the Role of Health Personnel, Particularly Physicians, in the Protection of Prisoners and Detainees against Torture, and Other Cruel, Inhuman or Degrading Treatment or Punishment. *See* Brief for Appellant at 19.

No source of legal authority—neither Bureau of Prisons regulations, nor the statute governing treatment of incompetent pretrial detainees, nor the Constitu-

2. *See, e.g.,* 8/20/99 a.m. Tr. at 59 (Dr. Johnson testifying that the standard of care for treating schizophrenia is antipsychotic medication); 4 Joint Appendix 103 (Report of Dr. Daniel stating that "[a]ntipsychotic medication is essential to the treatment of psychotic disorders such as schizophrenia. Psychotherapy without antipsychotic medication is not considered to be an effective treatment for schizophrenia."); 7/25/00 p.m. Tr. at 11 (Dr. Deprato's testimony that "[t]he diagnosis of paranoid schizophrenia is appropriately treated with antipsychotic medication"); 7/26/00 a.m. Tr. at 64 (Dr. Zonona's testimony: Question: "To your knowledge is there any hospital in this country that would not attempt to treat this patient with antipsychotic medication to address the illness as you understand it based on the materials that you've had an opportunity to sit in and review?" Answer: "Well, I think that is the standard treatment of choice these days [and] if you don't offer and try to use medication in a situation like this, it is negligent.").

3. There are two types of antipsychotic medication—the "typicals" and the "atypicals." The government proposed to use typicals, which are an older generation of antipsychotics. The district court found:

Typical antipsychotics can produce the following side effects: (1) dystonic or acute dystonic reactions, which involve a stiffening of muscles; (2) acuesthesia, which is restlessness or an inability to sit still; (3) Parkinsonian side effects, which can slow an individual; (4) tardive dyskinesia, which causes repetitive, involuntary tic-like movements of the face, eyelids, and mouth; (5) neuroleptic malignant syndrome ("NMS"), which causes temperature control problems and stiffness; and (6) perioral tremor, referred to as rabbit syndrome because of the mouth movements associated with it.
134 F.Supp.2d at 123. The atypicals, which the government has not ruled out, are newer and "have a more favorable side effect profile." *See id.* at 124. The court found that side effects from atypicals include: (1) Agranulocytosis, which could result in death but for which "there is a highly effective monitoring system to prevent this result"; (2) sedation; (3) weight gain; (4) seizures; and (5) problems with lipid metabolism. *See id.* It appears that antipsychotic medications could also alter Weston's demeanor, emotional affect, and cognitive function. *See* 7/24/00 p.m. Tr. at 49–50; 7/25/00 a.m. Tr. at 22–24; 7/26/00 a.m. Tr. at 62–63.

tion—makes medical ethics relevant to the determination whether the government can forcibly medicate Weston. Even if a particular doctor had ethical objections to administering antipsychotic drugs to a non-consenting patient, this would not undercut the consensus in the medical profession that antipsychotic medication is the medically appropriate response to Weston's condition.[4]

## A. Mitigating Dangerousness

A pretrial detainee's liberty interest in avoiding unwanted antipsychotic medication gives way when the medication is essential to mitigate the detainee's dangerousness: "Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the pretrial detainee's] own safety or the safety of others." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810. The district court applied this standard to Weston's situation and twice found antipsychotic medication medically appropriate and essential for his safety or the safety of those around him. *See Weston*, 134 F.Supp.2d at 121–32; *Weston*, 69 F.Supp.2d at 107–10.

On appeal of the district court's first decision, a panel of this court found the record insufficient to support application of the *Riggins* standard. Much of the evidence focused on the government's competency-for-trial justification—which the district court did not adopt—and the limited evidence supporting the dangerousness

justification "indicates that in his current circumstances Weston poses no significant danger to himself or to others." *Weston*, 206 F.3d at 13. The panel relied on the testimony of a Public Health Service physician assigned to FCI Butner that "[g]iven [Weston's] immediate containment situation, I feel confident that we can prevent him from harming himself or others under his immediate parameters of incarceration where he is in an individual room with limited access to anything that he could harm himself with or harm anyone else with, and he remains under constant observation." 2 Joint Appendix 121; *Weston*, 206 F.3d at 13. The panel concluded that involuntary medication was not "essential" for safety and instructed the district court that "[i]f the government advances the medical/safety justification on remand, it will need to present additional evidence showing that either Weston's condition or his confinement situation has changed since the hearing so as to render him dangerous." *Id.*

On remand, the district court received additional evidence showing that Weston's condition had deteriorated. In view of this evidence, the court once again found that Weston posed such a danger that medicating him was warranted. We think the previous panel's decision likely precluded that finding. That panel held that Weston's situation in confinement—total seclusion and constant observation—obviated any significant danger he might pose to himself or others. There appears no basis to believe that Weston's worsening condition renders him more dangerous

---

4. Defense counsel also claims that Weston's decision while he was medically competent not to take antipsychotic medication makes such medication medically inappropriate. *See* Brief for Appellant at 45. We shall assume arguendo that Weston's previous decision reflects his current informed judgment (which of course is unknowable). Nonethe-

less, withholding of consent does not make a treatment medically inappropriate. In *Harper*, for instance, the inmate reportedly said he "would rather die than take medication," 494 U.S. at 239, 110 S.Ct. 1028 (Stevens, J., separate opinion), but the Court approved the treatment as in the inmate's medical interest.

given his near-total incapacitation. Weston remains in seclusion under constant observation. Absent a showing that Weston's condition now exceeds the institution's ability to contain it through his present state of confinement, the prior decision appears to preclude a finding of dangerousness. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393, 1395 (D.C.Cir.1996) (en banc) (law-of-the-case and law-of-the-circuit doctrines). We need not determine whether our concurring colleague's different interpretation of the previous panel's decision is correct in view of our affirmance of the district court's competency-for-trial ground of decision. *See* Concurring Op. of Rogers, J., at 889-90.

## B. Restoring Competence to Stand Trial

In *Riggins*, the Court prescribed the conditions sufficient for a dangerousness justification, but explicitly declined to "prescribe ... substantive standards" for determining when other government interests override a pretrial detainee's liberty interest in refusing antipsychotic medication. *See Riggins*, 504 U.S. at 136, 112 S.Ct. 1810; *see also Weston*, 206 F.3d at 12–13 (also declining to prescribe substantive standards). The Court did, however, suggest that the governmental interest in restoring a pretrial detainee's competence to stand trial could override his liberty interest: "the State might have been able to justify medically appropriate, involuntary treatment with [antipsychotic medication] by establishing that it could not obtain an adjudication of [the pretrial detainee's] guilt or innocence by using less intrusive means." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810.

"The substantive issue involves a definition of the protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it." *Harper*, 494 U.S. at 220, 110 S.Ct. 1028 (quoting *Mills v. Rogers*, 457 U.S. 291, 299, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982)) (internal brackets omitted); *see also Foucha v. Louisiana*, 504 U.S. 71, 116, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (Thomas, J., dissenting) ("The standard of review determines when the Due Process Clause ... will override a State's substantive policy choices, as reflected in its laws."). Weston argues that the appropriate substantive standard is strict scrutiny and that involuntary medication must be "narrowly tailored to achieve a compelling government interest." *See* Brief for Appellant at 36–37; *accord United States v. Brandon*, 158 F.3d 947, 957 (6th Cir. 1998) (strict scrutiny applies to determination whether governmental interest in medicating nondangerous pretrial detainee to make him competent for trial outweighs liberty interest); *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984) (requiring use of "less restrictive alternatives"); *see also Kulas v. Valdez*, 159 F.3d 453, 455 (9th Cir.1998) (using heightened scrutiny under *Riggins*); *United States v. Sanchez–Hurtado*, 90 F.Supp.2d 1049, 1055 (S.D.Cal.1999) (same); *Khiem v. United States*, 612 A.2d 160, 165–66 (D.C.1992) (as amended on rehearing) (applying *Riggins* and requiring "a showing of overriding justification and medical appropriateness"). The government argues for an arbitrary and capricious standard like that employed to review administrative agency action. *See* Brief for Appellee at 22–27; *accord Harper*, 494 U.S. at 223, 110 S.Ct. 1028 (applying reasonableness standard to forcible medication of prisoners to mitigate dangerousness); *Weston*, 206 F.3d at 14–15 (Henderson, J., concurring); *United States v. Charters*, 863 F.2d 302, 306 (4th Cir.1988) (en banc) (liberty interest "is protected against arbitrary and capricious actions by government officials"); *United States v. Morgan*, 193 F.3d 252, 262 (4th Cir.1999) ("under *Charters*, the determi-

nation of whether to forcibly medicate a pretrial detainee ... rests upon the professional judgment of institutional medical personnel, subject only to judicial review for arbitrariness"); *United States v. Keeven,* 115 F.Supp.2d 1132, 1137 (E.D.Mo.2000) (following *Morgan*); *cf. Jurasek v. Utah State Hosp.,* 158 F.3d 506, 511 (10th Cir.1998) (applying *Harper*'s reasonableness standard to civilly committed patient); *see also Charters,* 863 F.2d at 312–13 (professional judgment standard from *Youngberg v. Romeo*); *Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) (same).

The Supreme Court denied that it had adopted a strict scrutiny standard in *Riggins. See Riggins,* 504 U.S. at 136, 112 S.Ct. 1810. It also appeared not to apply a reasonableness test or its various analogues: arbitrary and capricious, rational basis, or exercise of professional judgment. Rather, the opinion's language suggests some form of heightened scrutiny: the emphasis on the severity of infringement antipsychotic drugs impose on an individual's liberty interest, *see id.* at 134, 112 S.Ct. 1810; the reasoning that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of *overriding* justification," *id.* at 135, 112 S.Ct. 1810 (emphasis added); the statement that medicating to mitigate dangerousness must be "essential" and that the trial court must consider "less intrusive alternatives," *id.*; and the criticism of the district court's failure to find that "safety considerations or other compelling concerns outweighed Riggins' [liberty] interest," *id.* at 136, 112 S.Ct. 1810.

■ We think the appropriate standard is the one the Court set forth in the penultimate paragraph where it noted the lack of a "finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy...." *Id.* at 138, 112 S.Ct. 1810. Although that paragraph addressed trial prejudice, it outlines the standard the state failed to meet in ascertaining whether a governmental interest outweighs a right to avoid antipsychotic medication. Accordingly, to medicate Weston, the government must prove that restoring his competence to stand trial is necessary to accomplish an essential state policy.[5]

## 1. The Essential State Policy in Adjudicating Criminality

Preventing and punishing criminality are essential governmental policies. The Supreme Court has recognized that preventing crime is a compelling governmental interest. *See Schall v. Martin,* 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); *United States v. Salerno,* 481 U.S. 739, 749–50, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). This interest lies not just in incapacitating dangerous criminals, but also in demonstrating that transgressions of society's prohibitions will be met with an appropriate response by punishing offenders. *See Kansas v. Hendricks,* 521 U.S. 346, 361–62, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The Court has repeatedly adverted to the government's "compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *accord Texas v. Cobb,* 532 U.S. 162, ——, 121 S.Ct. 1335, 1343, 149 L.Ed.2d 321 (2001); *Gray v. Maryland,* 523 U.S. 185, 202, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (Scalia, J., dissenting); *McNeil v. Wisconsin,* 501 U.S. 171, 181, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Richardson v. Marsh,* 481 U.S.

---

5. The district court held the government to a clear-and-convincing-evidence burden of proof. *See* 134 F.Supp.2d at 121 & n. 12. Neither party challenges this determination.

200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Garrett v. United States,* 471 U.S. 773, 796, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (O'Connor, J., concurring).

The Court in *Riggins* recognized the strength of the government's policy in adjudicating criminality when it stated that the government "might" be able to involuntarily medicate a defendant if "it could not obtain an adjudication of [his] guilt or innocence by using less intrusive means," 504 U.S. at 135, 112 S.Ct. 1810, and when it cited Justice Brennan's statement that "Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace," *id.* at 135–36, 112 S.Ct. 1810 (quoting *Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)). We do not believe the Court's use of "might" reflects any tentativeness about whether the government could *ever* justify medicating to restore competence to stand trial. If that were what the Court had in mind we doubt that it would have included the statement. We read "might," rather, as indicating that the interest in adjudicating criminality is not necessarily an essential state policy under all circumstances. *Cf. Brandon,* 158 F.3d at 960–61 (no compelling interest in trying man accused of sending a threatening letter; factors relevant to this determination include seriousness of the offense, whether the pretrial detainee is dangerous, and whether the detainee will be released if not tried); *Khiem,* 612 A.2d at 176 & n. 1 (Ferren, J., dissenting from denial of rehearing en banc) ("Whereas the District may have a compelling state interest in force-medicating Khiem [to try him for murder], the District will not necessarily have such an interest in force-medicating pretrial detainees charged with lesser crimes.").

■ We need not decide under what circumstances trying and punishing offenders is not "essential." The government's interest in finding, convicting, and punishing criminals reaches its zenith when the crime is the murder of federal police officers in a place crowded with bystanders where a branch of government conducts its business. The Court made the point in *Salerno:* "While the Government's general interest in preventing crime is compelling, even this interest is heightened when the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community. Under these narrow circumstances, society's interest in crime prevention is at its greatest." 481 U.S. at 750, 107 S.Ct. 2095; *see also Khiem,* 612 A.2d at 167; *but see Bee v. Greaves,* 744 F.2d 1387, 1395 (10th Cir.1984). The statutory sentences for the crimes Weston is accused of committing—life in prison and death—reflect the intensity of the government's interest in bringing those suspected of such crimes to trial. *See* 18 U.S.C. §§ 1111, 1114.

Weston concedes that in "the ordinary case, the strength of the government's interest in trying a defendant accused of first degree murder is undisputed," but argues that when "the government seeks to forcibly medicate a defendant in order to try him, however, the case is no longer ordinary, because presumptions against forced medication have deep roots in the law." Brief for Appellant at 43. This argument is a reprise of the medical ethics point we considered and rejected in determining whether antipsychotic medication is medically appropriate. It has no more purchase here. The "presumption" against forced medication goes to the importance of Weston's constitutional right to refuse antipsychotic drugs (which we agree is substantial), not to the nature of the government's countervailing interest.

We also do not believe that the "governmental interest in medicating a defendant

in order to try him is diminished ... by the option of civil commitment." Note, *Riggins v. Nevada: Toward a Standard for Medicating the Incompetent Defendant to Competence*, 71 N.C. L.Rev. 1206, 1223 (1993). The civil commitment argument assumes that the government's essential penological interests lie only in incapacitating dangerous offenders. It ignores the retributive, deterrent, communicative, and investigative functions of the criminal justice system, which serve to ensure that offenders receive their just deserts, to make clear that offenses entail consequences, and to discover what happened through the public mechanism of trial. Civil commitment addresses none of these interests. In Weston's case, civil commitment would be based on his present mental condition, not on his culpability for the crimes charged: "criminal responsibility at the time of the alleged offenses ... is a distinct issue from his competency to stand trial." *Jackson v. Indiana*, 406 U.S. 715, 739, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *see also* 18 U.S.C. § 4241(f) ("A finding by the court that the defendant is mentally competent to stand trial shall not prejudice the defendant in raising the issue of his insanity as a defense to the offense charged, and shall not be admissible as evidence in a trial for the offense charged.").

### 2. Involuntary Medication is Necessary and there are no Less Intrusive Means

The sole constitutional mechanism for the government to accomplish its essential policy is to take Weston to trial. *See* U.S. Const. amend. V (no deprivation of life, liberty, or property without due process). Antipsychotic medication is necessary because, as the district court found, "antipsychotic medication is the only therapeutic intervention available that could possibly improve Weston's symptom picture, lessen his delusions, and make him competent to stand trial." *Weston*, 134 F.Supp.2d at 132. The government cannot "obtain an adjudication of [Weston's] guilt or innocence by using less intrusive means." *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810.

■ Although Weston does not propose any alternative means, he claims that the fit between involuntary medication and the government's interest is not sufficiently tight in two respects. First, he argues that the medication will not restore his competence to stand trial because he is not likely to respond to it. Second, he contends that the medication's mind-altering properties and likely side effects will prejudice his right to a fair trial such that the government could not lawfully try him even if his competence were restored. Either way, the argument goes, there is an insufficient probability that forcible medication will satisfy the government's interest.

We will treat what Weston styles the "narrow tailoring" requirement of strict scrutiny as an attack on the "necessity" of antipsychotic medication. In determining whether a governmental interest overrides a constitutional right, courts examine not only the nature of the right and the strength of the countervailing interest, but also the fit between the interest and the means chosen to accomplish it. This inquiry entails a predictive judgment about the probable efficacy of the means to satisfy the interest. In the terms of this case, antipsychotic medication may not be "necessary" if its use will not permit the government to try Weston.

That antipsychotic medication must be necessary to restore Weston's competence to stand trial does not mean there must be a 100% probability that it will produce this result. As the Court has recognized, "necessity" may mean "absolute physical necessity or inevitability" or "that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end

sought." *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 515 n. 13, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (plurality opinion) (quoting Black's Law Dictionary); *see also Board of Trustees v. Fox,* 492 U.S. 469, 476–77, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Even narrow tailoring in strict scrutiny analysis does not contemplate a perfect correspondence between the means chosen to accomplish a compelling governmental interest. *See Burson v. Freeman,* 504 U.S. 191, 206–10, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion).

The government has established a sufficient likelihood that antipsychotic medication will restore Weston's competence while preserving his right to a fair trial. *See Brandon,* 158 F.3d at 960. The district court acknowledged that "it is not certain that the medication will restore Weston's competency," but "credit[ed] the . . . testimony of the mental health experts that this outcome is likely." *Weston,* 134 F.Supp.2d at 132. The government presented evidence that antipsychotic medication mitigated symptoms for at least 70 percent of patients. *See* 7/24/00 p.m. Tr. at 108–09; 8/20/99 a.m. Tr. at 56; 11/15/00 a.m. Tr. at 57. Dr. Johnson testified that the response rate is probably higher with the atypicals. *See* 7/24/00 p.m. Tr. at 108–09. The government also provided reason to believe that the probability of restoring competence might be higher in Weston's case because of Weston's "relatively little exposure to antipsychotic medication" and his generally positive response to the limited medication he received in 1996. *See Weston,* 134 F.Supp.2d at 122; *see also* 8/20/99 a.m. Tr. at 56; 7/27/00 a.m. Tr. at 120–21; 4 Joint Appendix 105 (Report of Dr. Daniel).

The small possibility that antipsychotic medication will not make Weston compe-

tent for trial is certainly tolerable considering that antipsychotic medication is the sole means for the government to satisfy its essential policy in adjudicating the murder of federal officers. *See Burson,* 504 U.S. at 207–08, 112 S.Ct. 1846 (emphasizing that the means chosen is the "only way" to satisfy the state's compelling interest). The district court made the most precise predictive judgment it could in this context. *See* 8/20/99 a.m. Tr. at 56 (Dr. Johnson's testimony that "you are unable to predict in the individual case whether that individual will actually respond").

Weston points out that there is also a possibility that antipsychotic medication could prejudice his right to a fair trial by, for instance, altering his courtroom demeanor, interfering with his recollection and ability to testify, and obstructing his right to present an insanity defense. We agree with the district court that "[t]here is no reason to conclude, at this time, that involuntary medication would preclude Weston from receiving a fair trial." *Weston,* 134 F.Supp.2d at 137.

The general right to a fair trial includes several specific rights such as the right to be tried only while competent, that is, while able to understand the proceedings, consult with counsel, and assist in the defense. *See Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). As we determined, there is a sufficiently high probability that antipsychotic medication will restore Weston's competence to stand trial. The district court found and the evidence indicates that "a strong likelihood exists that medication will enhance some of Weston's trial rights, particularly his right to consult with counsel and to assist in his defense." *Weston,* 134 F.Supp.2d at 133.[6]

---

6. *See* 7/24/00 p.m. Tr. at 8 (Dr. Johnson's testimony that "I would really expect him,

from a mental status standpoint, to be functioning in a much enhanced manner over his

Another aspect of the right to a fair trial is Weston's right to testify and "to present his own version of events in his own words." *Rock v. Arkansas*, 483 U.S. 44, 49, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The defense is concerned that the medication might affect Weston's memory and his capacity to relate his delusions and other aspects of his mental state at the time of the crime, which in turn "may impair his ability to mount an effective insanity defense." *Weston*, 206 F.3d at 21 (Tatel, J., concurring); *see also* 18 U.S.C. § 17 (affirmative defense of insanity). But the record contains no basis to suppose that antipsychotic drugs will prevent Weston from testifying in a meaningful way. Rather, it indicates that medication will more likely improve Weston's ability to relate his belief system to the jury. *See* 7/24/00 p.m. Tr. at 49–51. The benefits of antipsychotic medication in terms of Weston's ability to understand the proceedings and communicate with his attorneys presumably will also translate into an improved capacity to communicate from the witness stand. And although memory loss is a potential side effect, Dr. Johnson testified that she thought "he'd be able to remember his belief system." 7/24/00 p.m. Tr. at 50 (also stating that "I don't think the treatment would impact his memory"); *see also* 7/25/00 a.m. Tr. at 4–5 (Dr. Johnson's testimony that "I don't expect him to lose the memory of his delusional beliefs as a result of treatment").

There is a possibility that the medication could affect Weston's behavior and demeanor on the witness stand such that the jury might regard his "synthetically sane" testimony as inconsistent with a claim of insanity. As Justice Kennedy put it in *Riggins*, "[i]f the defendant takes the stand ... his demeanor can have a great bearing on his credibility and persuasiveness, and on the degree to which he evokes sympathy." *Riggins*, 504 U.S. at 142, 112 S.Ct. 1810 (Kennedy, J., concurring). We recognize this small risk, but we see little basis to suppose that the jury will take Weston's testimony (if he decides to testify) as an indication that he must have been sane at the time of the crime, or that he is making it up, or that he deserves no sympathy. There is ample evidence of Weston's history of mental illness and bizarre behavior; the jury's overall impression of Weston will depend as much on this evidence as his testimony.

The district court also correctly held that a defendant does not have an absolute right to replicate on the witness stand his mental state at the time of the crime. *See Weston*, 134 F.Supp.2d at 134. A defendant asserting a heat-of-passion defense to a charge of first degree murder does not have the right to whip up a frenzy in court to show his capacity for rage, nor does a defendant claiming intoxication have the right to testify under the influence. *See Weston*, 206 F.3d at 15 (Henderson, J., concurring). There is little meaningful distinction between these cases and medication-induced competence to stand trial. Either way, the defendant's mental state on the stand is different from the mental state he claims to have operated under at the time of the crime. The tolerable level

current psychotic state to the point where I believe his competence could be restored"); *id.* at 9 (Dr. Johnson stating that "I actually firmly believe that treatment with the medication will enhance his ability to follow the issues at the trial"); 7/25/00 a.m. Tr. at 24 (Dr. Johnson's testimony that "successful treatment would result in a decrease in his delusional thinking, hopefully a resolution of

that, an increase in his attention, ability to concentrate, and a change in his affect, or the way his mood appears to someone who is looking onto the situation. His preoccupation with his delusional system has led me to believe at various points that he has also experienced some hallucinatory phenomena, and I would expect that to resolve.").

of difference no doubt increases in a case like this where there is substantial evidence of mental state other than the defendant's present appearance.

Weston will not have to rely solely on his own testimony to show his state of mind on July 24, 1998. Involuntary medication therefore stands little chance of impairing his right to present an insanity defense. There is extensive documentation and testimony concerning Weston's delusional system, his history of mental illness, and his "behavior, appearance, speech, actions, and extraordinary or bizarre acts ... over a significant period." *Weston*, 134 F.Supp.2d at 135–36. Multiple experts have examined Weston and presumably may testify. Many of these examinations no doubt related to his trial competence, but "[t]he tapes and psychiatric reports ... document Weston's delusional state over several years." *Id.* at 135. There is also a taped interview in which Weston discussed his delusional beliefs with the Central Intelligence Agency. *See id.* at 135 n. 22. Given the wealth of expert and lay testimony and other documentation the district court described, *see id.* at 135–36, Weston's insanity defense does not stand or fall on his testimony alone.

A third trial right that could be implicated by antipsychotic medication is Weston's right to be present at trial in a state that does not prejudice the factfinder against him. *See Estelle v. Williams*, 425 U.S. 501, 503–04, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Illinois v. Allen*, 397 U.S. 337, 338, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). To the extent the medication alters Weston's demeanor, courtroom behavior, or reactions to events in the courtroom, it may cause the jury to see Weston in a state that might seem inconsistent with a claim of insanity. It could also produce a flattened emotional affect that could convey to the jury a lack of remorse, a critical consideration if this case proceeded to sentencing.

Here again the record indicates that medication will likely enhance rather than impair Weston's right to a fair trial. Dr. Johnson stated that medication "will alter [Weston's demeanor] to the extent that it will be more a return to his baseline nonpsychotic state. I would anticipate he would have less blunting or flattening of his affect. He would be able to respond more appropriately from an emotional standpoint with his facial expression than he is now." 7/24/00 p.m. Tr. at 8; *see also* 7/25/00 a.m. Tr. at 22–24 (Dr. Johnson agreeing with the proposition that, with medication, Weston's "expressions potentially could be more appropriate to the context of what's occurring in the courtroom"; also, her testimony that "[i]t is the patient who is over-medicated or whose side effects are not managed who would demonstrate an increased lack of responsiveness").

The possibility of side effects from antipsychotic medication is undeniable, but the ability of Weston's treating physicians and the district court to respond to them substantially reduces the risk they pose to trial fairness. The district court found that Weston's doctors can manage side effects in a number of ways: "the Court credits the testimony of the government experts and Dr. Daniel, the independent expert, that the side effects of medication are manageable through adjustments in the timing and amount of the doses, and through supplementary medications." *Weston*, 134 F.Supp.2d at 137; *see also* 11/15/00 a.m. Tr. at 125 (Dr. Daniel's testimony that antipsychotic medications have side effects but "[g]enerally they can be treated or an adjustment made in the medication, or the medication replaced with a different one. There's generally a way to deal with the side effects."); 4 Joint Appendix 102 (Statement in Dr. Daniel's re-

**886**

port to the district court that "the side effects can most often be managed or an alternative course of treatment provided to the benefit of the patient. General experience with antipsychotics, particularly the newer medications, indicates that given their benefits they are reasonably safe and well-tolerated."). As the Court wrote in *Harper*, the "risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals." 494 U.S. at 233, 110 S.Ct. 1028.[7]

The district court also has measures at its disposal: "If Weston is medicated and his competency is restored, the Court is willing to take whatever reasonable measures are necessary to ensure that his rights are protected. This may include

informing the jurors that Weston is being administered mind-altering medication, that his behavior in their presence is conditioned on drugs being administered to him at the request of the government, and allowing experts and others to testify regarding Weston's unmedicated condition, the effects of the medication on Weston, and the necessity of medication to render Weston competent to stand trial." *Weston*, 134 F.Supp.2d at 137. Weston is free to propose other options.

There is a very high probability that involuntary medication will serve the government's essential interest in rendering Weston "competent to stand trial in a proceeding that is fair to both parties." *Brandon*, 158 F.3d at 954.[8] Given the lack

7. Antipsychotic drugs have progressed since Justice Kennedy discussed their side effects in *Riggins*. There is a new generation of medications having better side effect profiles. *See Weston*, 134 F.Supp.2d at 134 (citing Justice Kennedy's concurrence and writing that "[a]dvances in the primary antipsychotic medications and adjunct therapies make such side effects less likely"); Paul A. Nidich & Jacqueline Collins, *Involuntary Administration of Psychotropic Medication: A Federal Court Update*, 11 No. 4 HEALTH LAWYER 12, 13 (May 1999) ("[I]n light of the progress made in the development of new antipsychotic medications since the Supreme Court's *Riggins* decision in 1992, the courts should revisit this issue with an open mind.... [Because of new atypicals,] the fear of side effects should not weigh heavily in the decision whether to treat pretrial detainees or civilly committed persons with antipsychotic medication against their will when that treatment is medically appropriate."). Although the government presently plans to medicate Weston with the older generation of typicals, it could switch to the newer atypicals if side effects from the typicals threaten to impair his right to a fair trial. The district court analyzed the side effects of both. *See Weston*, 134 F.Supp.2d at 123–25. Dr. Johnson testified that Weston cannot be treated with atypicals unless he agrees to take them orally. *See* 7/24/00 a.m. Tr. at 108–09. The parties dispute whether Weston would so agree. When Weston origi-

nally withheld consent to antipsychotic medication, he indicated that he would comply with court-ordered medication. *See* 5/28/99 a.m. Tr. at 3.

8. Although the bulk of Weston's fair trial argument relates to the narrow tailoring aspect of his Fifth Amendment substantive due process argument, he makes a fleeting reference to an independent right to a fair trial in arguing for strict scrutiny: "Weston's Fifth and Sixth Amendment rights to a fair trial are also at stake because the forced administration of antipsychotic medication may 'have a prejudicial effect on [Weston's] physical appearance at trial' and have an adverse effect on his 'ability to participate in his own defense.'" Brief for Appellant at 37. To the extent this cursory reference suffices to raise this claim, this is not the occasion to evaluate it. Whether antipsychotic medication will impair Weston's right to a fair trial is best determined when the actual effects of the medication are known, that is, after he is medicated. (This is in contrast to the narrow tailoring component of Weston's bodily integrity claim, which requires a predictive judgment now.) As Judge Tatel stated in the previous panel opinion, "the difficulty inherent in predicting how a particular drug will affect a particular individual may well lead the district court to conclude that it cannot make this determination about Weston without first medicating him. In that event, I see

of alternative means for the government to satisfy its essential policy, we cannot demand more.

### III. Guardian *ad Litem*

Weston also appeals the district court's refusal to appoint a guardian *ad litem.* The district court concluded that it lacked authority to appoint a guardian and expressed uncertainty about what function a guardian would perform if appointed. *See* 7/24/00 a.m. Tr. at 2–3.

We need not decide whether the court had discretion to appoint a guardian and, if so, whether it abused that discretion in declining to exercise it. The issue is not relevant to the outcome of this case. If the guardian consented on Weston's behalf, the government presumably may medicate him. *See* Reply Brief for Appellant at 24–25 (stating that a guardian "would effectively stand in Weston's shoes" and that "Weston's counsel also explained at a hearing that a guardian could take the position that the guardian should do as the guardian saw fit with Weston—which would include allowing medication"); *see also* 7/27/00 a.m. Tr. at 108–09. If the guardian withheld consent, we are in the same position as without a guardian: the government's interest in restoring Weston's competence to stand trial outweighs his liberty interest. If the guardian issue is otherwise relevant, Weston has failed to show it.

\* \* \* \* \* \*

Because antipsychotic medication is medically appropriate and is necessary to accomplish an essential state policy, the

district court's order permitting the government to forcibly medicate Weston is
*Affirmed.*

RANDOLPH, Circuit Judge, with whom Circuit Judge SENTELLE joins, concurring:

I write separately because I believe *United States v. Weston,* 206 F.3d 9 (D.C.Cir.2000), our first decision in this case, may have embodied a serious error.

Concluding that Weston was not sufficiently dangerous to warrant forcibly medicating him, the panel wrote that "in his current circumstances Weston poses no significant danger to himself or to others." *Weston,* 206 F.3d at 13. This was so because Weston was confined to a room, under constant observation and had no access to anything he could use to harm himself or others. *See id.* The upshot, the panel concluded, was that "[i]f the government advances the medical/safety justification on remand, it will need to present additional evidence showing that either Weston's condition or his confinement situation has changed since the hearing so as to render him dangerous." *Id.*

This standard puts the government in an unnecessary quandary. If Weston were no longer confined to a room and under constant surveillance, he would be dangerous and, presumably, could be medicated. However, because the government cannot medicate him while he is carefully confined—and therefore, not dangerous—it cannot release him into the general pretrial detention population without incurring substantial risks. The result: the

no reason why the potential for side effects would preclude the district court from ordering medication, provided that, should Weston become competent to stand trial, the district court conducts a second hearing to determine the extent to which any side effects Weston is *actually* experiencing might affect

his fair trial rights." *Weston,* 206 F.3d at 21 (Tatel, J., concurring). The district court stated that it "will conduct subsequent evidentiary hearings" on this point. *Weston,* 134 F.Supp.2d at 138; *see also United States v. Morgan,* 193 F.3d 252, 264–65 (4th Cir. 1999).

government is all but forced to keep Weston in isolation, a condition almost everyone agrees is detrimental to Weston's long-term mental health.

The statutes—18 U.S.C. §§ 4241–4247—provide a far different standard for dangerousness than the prior panel's decision, and represent not only the good judgment of Congress and the President, but also the Judicial Conference of the United States which "after long study by a conspicuously able committee, followed by consultation with federal district and circuit judges," proposed the legislation. *Greenwood v. United States,* 350 U.S. 366, 373, 76 S.Ct. 410, 100 L.Ed. 412 (1956). Under § 4246, a person is to be held and treated if "his *release* would cause a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(d) (italics added). Thus, the question on Weston's first appeal should not have been whether he was dangerous given the manner in which he was confined, but whether he was dangerous as a general matter, that is, if he were released from strict confinement and observation.

Our concurring colleague proposes a different reading of the prior panel's decision. Because of the problems just discussed, I hope her view eventually prevails even though the language of that opinion, quoted above, does not seem to support her.

ROGERS, Circuit Judge, concurring:

I write separately on two points: the findings necessary for forcible administration of medication in a pretrial context, and the determination of dangerousness to support such governmental intrusion.

First, following the instruction in *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the court applies a "form of heightened scrutiny," Opinion at 880, in considering a number of factors for balancing the interests of the

government and the defendant. Succinctly put, to medicate Weston against his will, "the government must prove that restoring his competence to stand trial is necessary to accomplish an essential state policy." Opinion at 880. The substantive analysis that the court employs encompasses, however, at least three distinct determinations. To allow the government forcibly to medicate a defendant prior to trial with antipsychotic drugs, the district court must find that: (1) an "essential state policy" is at issue, *Riggins,* 504 U.S. at 138, 112 S.Ct. 1810; (2) "treatment with antipsychotic medication [is] medically appropriate and, considering less intrusive alternatives, essential for the sake of [the defendant's] own safety or the safety of others," or essential to enable an adjudication of the defendant's guilt or innocence, *id.* at 135, 112 S.Ct. 1810; and (3) the defendant's due process rights are protected. *See id.* at 137–38, 112 S.Ct. 1810.

The district court on remand made these three determinations. *See United States v. Weston,* 134 F.Supp.2d 115, 138 (D.D.C. 2001) (*Weston III*). On appeal, this court addresses the first determination under the heading "The Essential State Policy in Adjudicating Criminality." Opinion at 880. It addresses the second and third determinations under the heading of "Involuntary Medication is Necessary and there are no Less Intrusive Means." *Id.* at 882–83. The court provides a separate analysis of each determination. *Id.* at 883–87.

Keeping these determinations separate is important because the Supreme Court has acknowledged that a defendant's liberty interests may outweigh the State's interest. Although indicating that even "a substantial probability of trial prejudice" can be justified if "administration of antipsychotic medication [is] necessary to accomplish an essential state policy," *Rig-*

*gins*, 504 U.S. at 138, 112 S.Ct. 1810, the Court has suggested that the defendant's liberty interests would prevail where, for example, the antipsychotic medication impairs the defendant's "ability to follow the proceedings" or to present a defense. *Id.* at 137, 112 S.Ct. 1810; *see also Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). In such circumstances, the government would have the option of seeking civil commitment of the defendant. *See Riggins*, 504 U.S. at 145, 112 S.Ct. 1810 (Kennedy, J., concurring in the judgment); *see generally* 18 U.S.C. §§ 4241–4247; D.C.Code 1981 §§ 21–541 to 21–551. For the reasons set forth by the court, the due process concerns relating to evidence of Weston's mental state and to his competency to stand trial are attenuated. *See* Opinion at 883-87.

Second, the court eschews review of the district court's determination on remand that forced medication was justified because of Weston's dangerousness to himself or others. The court views our decision in *United States v. Weston*, 206 F.3d 9 (D.C.Cir.2000) (per curiam) (*Weston II*) to have "likely precluded" a finding of dangerousness in the absence of evidence that "Weston's condition now exceeds the institution's ability to contain [his dangerousness] through his present state of confinement." Opinion at 879. To suggest that *Weston II* created a "standard" other than the traditional dangerousness standard applicable to pretrial detainees is to misread *Weston II*. *See* Concurring Opinion at 887-88; *see also* Opinion at 879; 18 U.S.C. § 4246(d)(2); 28 C.F.R. § 549.43.

The court in *Weston II* did not "put[ ] the government in an unnecessary quandary." Concurring opinion at 887. The court's language must be read in context. In stating that "[i]f the government advances the medical/safety justification on remand, it will need to present additional evidence showing that either Weston's condition or his confinement situation has changed since the hearing so as to render him dangerous," *Weston II*, 206 F.3d at 13, the court was addressing the insufficient evidence of dangerousness in the record before it to support a finding that involuntary medication was "essential" for Weston's safety or the safety of others. *See id.* That evidence showed that as then confined in isolation by the government, Weston did not, in the opinion of the government's treating psychiatrist, pose a significant danger to himself or others. *See id.* What was missing from the district court record was a "searching inquiry into whether less intrusive alternatives [to forced medication] would have been sufficient to control any potential danger posed by Weston to himself and to others." *Id.* at 18 (Rogers, J., concurring in the judgment). The court forewarned, however, that to rely on dangerousness as a basis for forced medication, the government on remand would need to present evidence that showed more than that when confined Weston did not pose a significant danger to himself or others. *See id.* at 13. The government thus remained free to present evidence about the risks of danger that would be created if Weston was not confined in isolation and that less intrusive alternatives to forced medication would be ineffective to control his dangerousness.

The record on remand indicates that the parties and the district court understood what "additional evidence" of dangerousness was required by *Weston II*; none has suggested that the government confronted a "quandary." *See* Br. for Appellee at 28, 38, 41–42; *see also* Opinion at 879. Expert medical testimony was offered on Weston's dangerousness in and out of seclusion, distinguishing between Weston's state of mind and his ability to act on his delusions. *See, e.g.,* Test. of Dr. Daniel, 4

JA at 27–73. To the point, the government now argues in its brief that Weston's "seclusion from the general population is not an 'alternative' to involuntary medication because it has done nothing to quell [his] dangerous behavior," Br. for Appellee at 42, and that "'prolonged use' of seclusion 'brings risk of detrimental effects to the psychological well-being of the patient,' and is 'inherently aversive.'" *Id.* at 43 (quoting expert medical testimony presented on remand). Hence, the government's "quandary" is a creation of the concurrence.