**UNITED STATES of America,**
**Appellee,**

v.

**Aaron GOMES, Defendant–Appellant.**

**Docket No. 01–1143.**

United States Court of Appeals,
Second Circuit.

Argued: July 11, 2001.

Decided: April 24, 2002.

Jeremiah Donovan, (Todd Kennedy, Law Student, New Haven, CT, on the brief), Old Saybrook, CT, for Defendant–Appellant.

Thomas V. Dailey, Assistant United States Attorney (John A. Danaher III, United States Attorney for the District of Connecticut, New Haven, CT, on the brief), Hartford, CT, for Appellee.

Jonathan E. Nuechterlein (Paul A. Engelmayer, Trevor W. Morrison, on the brief), Wilmer, Cutler & Pickering, Washington, DC (Nathalie F.P. Gilfoyle, General Counsel, James L. McHugh, Senior Counsel, American Psychological Association, Washington, DC, on the brief), for Amicus Curiae American Psychological Association.

Richard G. Taranto, Farr & Taranto, Washington, DC, for Amicus Curiae American Psychiatric Association.

John L. Warden (Penny Shane, on the brief), Sullivan & Cromwell, New York, NY (Franklin B. Velie, Dierdre A. Burgman, Salans Hertzfeld Heilbronn, Christy & Viener, New York, NY, on the brief) (Gerald Walpin, David L. Wales, Rosenman & Colin, New York, NY, on the brief), for Amicus Curiae the Federal Bar Council.

William J. Rold, New York, NY, for Amicus Curiae the National Commission on Correctional Health Care.

Before: WALKER, Chief Judge, CABRANES and STRAUB, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

This appeal requires us to determine the appropriate standard under which involuntary medication may be ordered to render a non-dangerous criminal defendant competent to stand trial. Defendant-appellant Aaron Gomes appeals from the February 6, 2001 order of the United States District Court for the District of Connecticut (Christopher F. Droney, *District Judge*) authorizing Gomes's involuntary medication with antipsychotic drugs, subject to certain conditions, to render him competent to stand trial for the charged criminal conduct, and extending his commitment to the custody of the Attorney General. On appeal, Gomes challenges only that part of the district court order authorizing his involuntary medication. We vacate the order of involuntary medication and remand for further proceedings in light of the standard we have adopted.

## BACKGROUND

On October 27, 1998, a federal grand jury indicted Gomes on one count of pos-

session of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment followed Gomes's arrest by the Hartford Police on September 30, 1998 for possession of a pistol without a permit, possession of a controlled substance, and possession of narcotics and theft of a firearm. On May 7, 1999, the government filed a notice informing the district court that because Gomes had at least three prior convictions for violent felonies or serious drug offenses, he qualified for a sentence enhancement as an Armed Career Offender under 18 U.S.C. § 924(e). With this enhancement, Gomes faces a mandatory minimum sentence of fifteen years' imprisonment.

Gomes has yet to stand trial for these charges. After the district court denied Gomes's motion to suppress evidence in April 1999, the proceedings in this case have centered on Gomes's competency to stand trial. On May 27, 1999, Gomes's own attorney first raised the issue. Citing "behavior of the defendant which casts some doubts as to defendant's competency," Gomes's counsel on June 1, 1999 sought authorization to have a psychiatrist determine Gomes's present competency and whether he was criminally insane at the time of the offense. However, Gomes refused to participate and this examination did not take place.

On June 23, 1999, the district court, on its own motion and without the benefit of expert testimony, found that there was "reasonable cause to believe that [Gomes] may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he may be unable to understand the nature and consequences of the proceedings against him and/or to assist properly in his defense." The district court ordered a competency hearing that was to be held after Gomes

was examined by a psychiatrist. Once again, Gomes refused to cooperate. On October 25, 1999, the district court, absent objection, ordered that Gomes be committed, pursuant to 18 U.S.C. § 4247(b), to the custody of the Attorney General for placement in a suitable psychiatric facility for thirty days for examination of his mental health and competency to stand trial.

## I. The Competency Hearings

After Gomes was examined at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("USMC–Springfield"), the district court scheduled a competency hearing. At the hearing, held on May 12, 2000, Gomes persisted in his refusal to participate and angrily objected to, among other things, certain witnesses who were to testify by teleconference. Gomes's efforts to obstruct the proceedings led to his removal from the courtroom. The district court proposed various measures that would have allowed Gomes to participate in the hearing from outside the courtroom, but none of these proposals were technologically feasible. Ultimately, without objection from counsel for either side, the district court held the hearing in Gomes's absence.

The government offered the testimony and written report of Dr. David Mrad, a Bureau of Prisons forensic psychologist. Dr. Mrad, who had examined Gomes at USMC–Springfield, concluded that Gomes was incompetent because, while he understood some aspects of the proceedings against him, he lacked a "rational understanding" of those proceedings and suffered from an undefined "psychotic disorder." Dr. Mrad's report cited numerous instances of Gomes's "persecutory ideas" and other delusions. Among these delusions is Gomes's insistence that the instant federal proceedings are part of a vast con-

spiracy against him orchestrated by the judge in a prior state court proceeding.

In a June 7, 2000 ruling, the district court found that Gomes was not competent to stand trial and ordered him committed to the custody of the Attorney General for three months to determine whether there was a substantial probability that Gomes would attain the capacity to stand trial in the foreseeable future. The district court agreed with Dr. Mrad that Gomes's persecutory delusions rendered him unable to assist in his own defense because his efforts would be directed toward uncovering the supposed "conspiracy" rather than defending against the actual charges. We affirmed the district court in an unpublished summary order dated October 2, 2000.

## II. The Administrative Involuntary Medication Proceedings

Upon his return to USMC–Springfield following the hearing, Gomes was examined again and prescribed antipsychotic medication. When Gomes refused to take the medication, two administrative hearings were held at USMC–Springfield, in accordance with the rules and procedures set forth at 28 C.F.R. § 549.43, to determine whether Gomes could be involuntarily medicated. The second hearing was necessary because it was unclear whether Gomes was given a copy of the report of the first hearing as required. The psychiatrists who presided at the hearings, Drs. Patrick C. Gariety and Carlos Tomelleri, concluded that antipsychotic medication was appropriate because it was the indicated treatment for Gomes's illness and other forms of treatment would not be likely to alleviate his symptoms. Gomes refused to take the prescribed antipsychotic medication.

On October 13, 2000, the government sought to have the district court supplement its earlier commitment order to extend the time of Gomes's commitment and to expressly authorize the Bureau of Prisons to medicate Gomes against his will. In a November 11, 2000 ruling and order, the district court granted the extension of time but denied authorization of involuntary medication. Because the government's interest in medicating Gomes was restoring him to competency so that he could be tried, and not the weightier interest of pacifying a dangerous detainee, the district court found that involuntary medication could not be ordered without first holding a judicial hearing.

## III. The District Court Involuntary Medication Proceedings

The district court held an involuntary medication hearing on December 28, 2000. The government argued that, in determining whether to order the involuntary medication of Gomes to render him competent to stand trial, the district court should employ the same standard that was used in the administrative hearings: the government need only show by a preponderance of the evidence that (1) weighing the benefits against the risks, the medication was medically appropriate; and (2) there were no less intrusive means that would enable the government to bring the defendant to trial. In the alternative, the government argued that the involuntary medication of Gomes was authorized under the strict scrutiny standard announced by the Sixth Circuit in *United States v. Brandon,* 158 F.3d 947, 957 (6th Cir.1998). To prove the necessity of forcibly medicating Gomes, the government offered the testimony of Dr. James K. Wolfson, Gomes's treating psychiatrist at USMC-Springfield.

In response, Gomes contended that such involuntary medication was never warranted unless the defendant posed a danger to himself or others. Because Gomes refused

to submit to a psychiatric examination, his defense was limited to his own testimony and cross-examination of the government's psychiatrist.

The district court concluded that it could order the involuntary medication of a non-dangerous defendant, but that the government must first show that the involuntary medication is "necessary to accomplish an essential government interest." The district court then listed eight factors that the government must establish by clear and convincing evidence:

1. Whether the government has an overriding justification for involuntarily medicating the defendant;

2. Whether psychotropic medication is medically appropriate and necessary;

3. Whether there are any less intrusive means by which to restore the defendant to competency;

4. Whether there is a sound medical basis for administering psychotropic medication;

5. Whether there is any significant risk that the medication will impair or alter in any material way the defendant's capacity or willingness to react to the testimony at trial or to assist his counsel;

6. Whether there are any apparent side-effects of the psychotropic medication;

7. Whether there are any other indications that the medication will in any way interfere with the defendant's ability to provide information to his attorney and to participate in the making of decisions on his own behalf at trial; and

8. Whether the defendant's appearance will be adversely [a]ffected or whether he will suffer other preju-

dice at trial as a result of involuntary medication.

Finally, the district court determined that it must weigh five additional factors: (1) the competing interests of the defendant and the government; (2) the dangerousness of the defendant; (3) the seriousness of the charged crime; (4) the possibility of the defendant's release in the event that he cannot be made to stand trial; and (5) the availability of less intrusive means by which the defendant could be restored to competency.

In concluding that the government had met its burden, the district court found that the government's interest in enforcing the federal criminal laws constituted an "essential, overriding justification for involuntary medicat[ion]." According to the court, Dr. Wolfson's testimony sufficiently established that the administration of the antipyschotic drugs was medically appropriate and necessary to reduce Gomes's persecutory delusions and restore his mental functioning; that there were no less intrusive means to do so; and that there was a "high likelihood" that the drugs would have the desired effect. The district court also found that the risks posed by side effects were neither sufficient to prohibit the use of the medication nor likely to interfere with Gomes's ability to participate in and assist with his trial. Based on these findings, the district court ordered the involuntary medication of Gomes with antipsychotic drugs, subject to certain conditions, and a two-month extension of his commitment to the custody of the Attorney General, pursuant to 18 U.S.C. § 4241(d)(2)(A).

Gomes appealed from this order. The district court stayed, during the pendency of the appeal, its order to medicate Gomes.

## DISCUSSION

The question of under what circumstances medication may be forcibly admin-

istered to a non-dangerous criminal defendant for the purpose of rendering him competent to stand trial is one of first impression in this circuit. Similarly, the Supreme Court has had "no occasion to finally prescribe ... substantive standards" to govern this question. *Riggins v. Nevada,* 504 U.S. 127, 136, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). Before we turn to that issue, however, we will address whether we have jurisdiction to decide this appeal.

## I. Appellate Jurisdiction

 The parties agree that we have appellate jurisdiction over the district court's non-final order that, among other things, authorizes the involuntary medication of Gomes, under the collateral order doctrine set forth in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Because jurisdiction cannot be conferred by the parties, however, we must independently decide the question.

 Under *Cohen* and its progeny, non-final orders are immediately appealable if they "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (footnote omitted); *see also Cohen,* 337 U.S. at 546, 69 S.Ct. 1221. Applying this standard, the Sixth and the Fourth Circuits have determined that they had appellate jurisdiction to review district court orders authorizing the involuntary medication of criminal defendants. *Brandon,* 158 F.3d at 950–51; *United States v. Morgan,* 193 F.3d 252, 258–59 (4th Cir.1999); *see also United States v. Sell,* 282 F.3d 560 (8th Cir.2002) (exercising, without expressly considering the issue, appellate jurisdic-

tion over a district court order authorizing the involuntary medication of a criminal defendant to render him competent to stand trial); *United States v. Weston,* 255 F.3d 873 (D.C.Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 670, 151 L.Ed.2d 583 (2001) (same).

We join our sister circuits in holding that the *Cohen* test is satisfied here. The district court's order conclusively determined the question before it, namely whether Gomes may be involuntarily medicated. Also, the issues involved in determining whether to order involuntary medication are separate from the merits of the underlying criminal charges. *See Morgan,* 193 F.3d at 259; *Brandon,* 158 F.3d at 951. Finally, the district court's order is effectively unreviewable on appeal. If the defendant should prevail after he has been forcibly medicated, his right to refuse to be medicated would have been lost and his victory would be a hollow one. *See Morgan,* 193 F.3d at 259. Thus, we have jurisdiction.

## II. Involuntary Medication

While the Supreme Court has yet to articulate a standard for determining when a non-dangerous criminal defendant may be involuntarily medicated to render him competent to stand trial, it has framed the issue in general terms. "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it." *Washington v. Harper,* 494 U.S. 210, 220, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (quoting *Mills v. Rogers,* 457 U.S. 291, 299, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) (citations omitted)) (internal quotation marks omitted, alterations in original). Our first task, then, is to identify the competing interests of the defendant and the government.

*A. The Defendant's Interest in Avoiding Unwanted Medication*

There can be little doubt that the "forcible injection of medication into a non-consenting person's body ... represents a substantial interference with that person's liberty." *Riggins*, 504 U.S. at 134, 112 S.Ct. 1810 (quoting *Harper*, 494 U.S. at 229, 110 S.Ct. 1028) (internal quotation marks omitted). As the Supreme Court has noted, the "purpose of the [antipsychotics] is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes.... [I]t is also true that the drugs can have serious, even fatal, side effects." *Id.* (quoting *Harper*, 494 U.S. at 229, 110 S.Ct. 1028) (citation and internal quotation marks omitted). Given this level of invasiveness and the severity of the possible side effects of antipsychotic medication, it follows that the non-consenting criminal defendant's liberty interest to be free from this sort of bodily intrusion under the Due Process Clause of the Fourteenth Amendment is a substantial one. *See, e.g., Weston*, 255 F.3d at 876; *Brandon*, 158 F.3d at 953.

When the drugs are being administered to render the defendant competent to stand trial, the defendant has other interests that come into play after the administration of the medication. It is unconstitutional for the government to bring an incompetent defendant to trial. *See Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Even when they restore competency, in particular cases antipsychotic drugs can affect a defendant's in-court demeanor as well as his willingness and ability to assist in his defense, thereby implicating Sixth Amendment rights to a fair trial. *Riggins*, 504 U.S. at 142, 112 S.Ct. 1810 (Kennedy, J., concurring); *Weston*, 255 F.3d at 876, 883–86; *Brandon*, 158 F.3d at 954. In addi-

tion, some courts have found—and Gomes presses the argument in this appeal—that a criminal defendant "has a First Amendment interest in avoiding forced medication, which may interfere with his ability to communicate ideas." *Brandon*, 158 F.3d at 953; *see also Bee v. Greaves*, 744 F.2d 1387, 1393–94 (10th Cir.1984).

*B. The Government's Countervailing Interests in Prosecution*

The government's countervailing interests are no less substantial and, under certain circumstances, outweigh those of the criminal defendant. The Supreme Court has on numerous occasions recognized that the "individual's strong interest in liberty," even though "importan[t] and fundamental ... may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." *United States v. Salerno*, 481 U.S. 739, 750–51, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Moreover, "trial prejudice can sometimes be justified by an essential state interest," *Riggins*, 504 U.S. at 138, 112 S.Ct. 1810, and the Supreme Court has rejected the view that the rights protected by the First Amendment are "absolutes." *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961) (citation and internal quotation marks omitted).

The government's interest in bringing a criminal defendant to trial is a fundamental one. The "[c]onstitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace." *Illinois v. Allen*, 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring); *see also Win-*

*ston v. Lee,* 470 U.S. 753, 762, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). In the context of forcibly administering antipsychotic medication to render a criminal defendant competent to stand trial, the government's interest in prosecution has been deemed "essential," *Sell,* 282 F.3d at 568, *Weston,* 255 F.3d at 880; "substantial," *Brandon,* 158 F.3d at 954; and "vital," *State v. Garcia,* 233 Conn. 44, 74, 658 A.2d 947, 962 (1995). As the District of Columbia Circuit noted in *Weston,* even though civil commitment might reduce the danger to the community posed by an individual, it cannot address a host of other important societal concerns and values served by a criminal trial: "the retributive, deterrent, communicative, and investigative functions of the criminal justice system, . . . serve to ensure that offenders receive their just deserts, to make clear that offenses entail consequences, and to discover what happened through the public mechanism of trial." 255 F.3d at 882. The government's interest in the prosecution of crime generally is a substantial and important interest, and it is usually an essential one.

## III. The Standard for Involuntary Medication

With these competing interests in mind, we turn to the circumstances under which the government's interests are likely to outweigh those of the defendant. Abjuring any definitive pronouncements, the Supreme Court in *Riggins* has offered some suggestions as to the baseline requirements that must be met before antipsychotic drugs may be forcibly administered to a non-dangerous criminal defendant to render him competent to stand trial.

### A. The Substantive Standard

In *Riggins,* the defendant, who was sentenced to death following his conviction for murder and robbery, challenged a state court's order denying his motion to halt the administration of antipsychotic medication during his trial. 504 U.S. at 130–32, 112 S.Ct. 1810. The Court reversed, but concluded that it had "no occasion to finally prescribe . . . substantive standards . . . [for involuntary medication], since the [trial court] allowed administration of [antipsychotic medication] to continue without making *any* determination of the need for this course or *any* findings about reasonable alternatives." *Id.* at 136, 112 S.Ct. 1810 (emphasis in original).

■■■■ One of the lessons we draw from *Riggins* is that before the government is permitted to forcibly medicate a criminal defendant to bring him to trial, the trial court must make explicit findings as to the factors that weigh in the balance and the government's showing that these factors weigh in its favor. In particular, the Court indicated that forced medication might be allowable if, in addition to being medically appropriate, it were necessary to bringing a non-dangerous criminal defendant to trial. *See id.* at 135, 112 S.Ct. 1810 ("[T]he State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means."); *id.* ("[O]nce Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug."). The Court also set forth a standard of heightened, but not "strict," scrutiny for determining when the possible prejudice to a defendant's fair trial rights might be outweighed by the government's interest in prosecution: "administration of antipsychotic medication [that is] necessary to accomplish an essential state policy." *Id.* at 138, 112 S.Ct. 1810; *see also id.* at 136, 112 S.Ct. 1810 ("Contrary to the

dissent's understanding, we do not 'adopt a standard of strict scrutiny.' ") (citation omitted).

 We agree with the observations of our sister circuits that the Supreme Court in *Riggins* "suggest[ed] that the governmental interest in restoring a pretrial detainee's competence to stand trial could override his liberty interest," *Weston*, 255 F.3d at 879; *see also Sell*, 282 F.3d at 566, and that "the opinion's language suggests some form of heightened scrutiny," *Weston*, 255 F.3d at 880; *see also Sell*, 282 F.3d at 567 & n. 7. In accord with *Riggins*, *Sell*, and *Weston*, we hold that heightened, but not strict, scrutiny is the appropriate standard for determining when a non-dangerous criminal defendant may be forcibly medicated with antipsychotic drugs for the purpose of rendering him competent to stand trial. We think that the government must show, and the district court must explicitly find, by clear and convincing evidence (1) that the proposed treatment is medically appropriate, *see Sell*, 282 F.3d at 567; *Weston*, 255 F.3d at 876; (2) that it is necessary to restore the defendant to trial competence, *see Sell*, 282 F.3d at 567; *Weston*, 255 F.3d at 882; (3) that the defendant can be fairly tried while under the medication, *see Sell*, 282 F.3d at 571; *Weston*, 255 F.3d at 883; and (4) that trying the defendant will serve an essential government interest, *see Sell*, 282 F.3d at 567; *Weston*, 255 F.3d at 880; *see also United States v. Sanchez–Hurtado*, 90 F.Supp.2d 1049, 1055 (S.D.Cal.1999) (following *Riggins* in prescribing a heightened scrutiny standard and several other factors).

 The process of medicating a defendant is a dynamic one. It can be evaluated over the course of treatment to ascertain, with expert assistance, both its effectiveness and the nature of any side effects. Accordingly, we believe that a district court ordering involuntary medication must closely monitor the process to ensure that the dosage is properly individualized to the defendant, that it continues to be medically appropriate, and that it does not deprive him of a fair trial or the effective assistance of counsel. *See Sell*, 282 F.3d at 572 (noting with approval the district court's willingness to reconsider the defendant's fair trial rights after the administration of the medication). There are three principal reasons why we believe the foregoing standard is the appropriate one.

*B. The Government's Overriding Interest in Prosecution*

 First, we are convinced that, while an individualized finding must be made in each case, in most although not necessarily all of them, the district court will be considering a government interest in prosecution that will be found to weigh heavily in the balance. In our view, a strict scrutiny standard, such as that adopted by the Sixth Circuit, is unduly restrictive because strict scrutiny has come to be considered "fatal in fact." *See Brandon*, 158 F.3d at 956. Although we are not unmindful of *Brandon's* concerns about the important interests of the defendant, we cannot accept the proposition that involuntary medication should be limited to defendants who are prosecuted for only the most heinous crimes. *Cf. Sell*, 282 F.3d at 572 (Bye, J., dissenting) ("*Weston* [involving, among other things, two counts of murder and one count of attempted murder of federal law officers] typifies the case where the government's interest is paramount because the charges include the most serious crimes known to man."). As will be discussed in more detail below, we believe that in most cases a flexible regime can accommodate both the government's interest in prosecution and the defendant's

health interests and fair trial rights consistent with constitutional requirements.

### C. Protection of the Defendant's Health Interests and Fair Trial Rights

Second, recent advances in antipsychotic medication reduce our concerns that the defendant's health interests and fair trial rights cannot be adequately protected when he is involuntarily medicated to render him competent to stand trial. These concerns, which Gomes forcefully presents, were carefully articulated by Justice Kennedy in his concurrence in *Riggins,* 504 U.S. at 138–45, 112 S.Ct. 1810, and have been repeated in subsequent decisions. *See Brandon,* 158 F.3d at 961; *United States v. Santonio,* No. 2:00–CR–90C, 2001 WL 670932, at *3 (D.Utah May 3, 2001); *Woodland v. Angus,* 820 F.Supp. 1497, 1510 n. 15 (D.Utah 1993). Justice Kennedy was particularly troubled that the side effects of these drugs might, by making the defendant look bored or unfeeling, prejudice the jury and affect the outcome of the trial. *Riggins,* 504 U.S. at 142–43, 112 S.Ct. 1810. In addition, he believed that the drowsiness and mind-dulling effects of these drugs might "hamper the attorney-client relation, preventing effective communication and rendering the defendant less able or willing to take part in his defense." *Id.* at 144, 112 S.Ct. 1810.

These are important concerns. In responding to them, we first note that significant improvements have been made in antipsychotic medication in the decade since Justice Kennedy expressed his misgivings in *Riggins.* Justice Kennedy himself presciently acknowledged then that "[t]he state of our knowledge of antipsychotic drugs and their side effects is evolving and may one day produce effective drugs that have only minimal side effects." *Id.* at 145, 112 S.Ct. 1810. As the Ameri-

can Psychiatric Association has pointed out, a new generation of antipsychotic drugs "largely post-dating *Riggins*" and with a "more favorable side effect profile" has appeared. Amicus Br. of the Am. Psychiatric Ass'n at 3, 13–14 [hereinafter Am. Psychiatric Ass'n]. The American Psychological Association agrees, stating that these new drugs, called atypicals, "generally exhibit equal or improved therapeutic efficacy in comparison to the traditional or conventional agents, yet they have a more favorable side effect profile." Amicus Br. of the Am. Psychological Ass'n at 8 (citation and internal quotation marks omitted) [hereinafter Am. Psychological Ass'n]. Most of the atypicals present relatively low risks of the serious side effects associated with conventional drugs such as Mellaril, the drug at issue in *Riggins. See id.* at 8–9.

Gomes's effort to discount the significance of the atypicals is not convincing. Relying on the unavailability of atypicals in an injectable form that could be forcibly administered, Gomes argues that because he is likely to refuse medication, the more severe side effects attributable to injectable conventional drugs are also relevant. However, amicus American Psychological Association points out that two injectable forms of atypicals that could be forcibly administered have been recommended for approval by the FDA, and are pending approval. Am. Psychological Ass'n at 9 n. 9; *see also* Am. Psychiatric Ass'n at 15 n. 12 (noting that at least one injectable atypical "has now moved most of the way through the FDA approval process"). These atypicals could be considered for use, with approval or substantial progress in the FDA process of evaluation, upon an adequate scientific record.

Moreover, even if it were necessary to forcibly medicate Gomes with conventional drugs, we believe that Gomes's interests

could be sufficiently accommodated. *See Sell,* 282 F.3d at 571 (rejecting claim that the district court erred by basing its involuntary medication order in part on the availability of atypicals that could not be forcibly administered). Dr. Wolfson testified that in such cases the initially nonconsenting individual, after being restored somewhat and having become more cooperative, could be switched to atypicals. Even if this were not to occur, we note that the most harmful side effects associated with conventional antipsychotic medications are rare, result from years of usage, and, to the extent that they arise shortly after administration of the medication, are manageable. Furthermore, the involuntary administration of the medication would be of limited duration because the government's interest in involuntary medication ceases with the completion of the legal proceedings.

■■■■ Finally, whatever the risks of side effects may be, we believe that they are best dealt with in the context of the individual case rather than by blanket judicial pronouncements. We agree with the American Psychological Association that concerns about the medication's effect on the defendant's health interests and fair trial rights need to be considered in light of the individual defendant's response in the particular case and thus are "best addressed at the time of trial, after the drugs have already been administered and their effects in the given case are understood." Am. Psychological Ass'n at 26. In addition, the defendant always retains the ability to argue on direct appeal from his conviction that the involuntary medication order had the effect of denying him a fair trial.

## D. The Defendant's First Amendment Rights

Third, we do not think that a consideration of the defendant's First Amendment rights, at least insofar as they are raised in this appeal, alters the analysis derived from *Riggins, Sell,* and *Weston,* even though those cases did not explicitly consider these rights. Gomes argues that the involuntary administration of the antipsychotics would run afoul of the First Amendment by affecting his ability "to produce and communicate ideas," as well as his mood, attitude, and capacity to think.

■■■■ As an initial matter, we note that because Gomes articulated his First Amendment rights only in cursory and general terms, we are not certain as to the exact nature of his First Amendment claims. To the extent that Gomes's concerns about the drugs' effect on his mental processes and personality are an expression of fears that the antipsychotic medication will "alter the chemical balance in [his] brain, leading to changes, intended to be beneficial, in his ... cognitive processes," *Riggins,* 504 U.S. at 134, 112 S.Ct. 1810 (citation and internal quotation marks omitted), Gomes's First Amendment rights are in large part co-extensive with his due process liberty interest in avoiding unwanted medication. We have considered this interest, as have *Riggins, Sell,* and *Weston.*

■■■■ To the extent that Gomes seeks to assert other First Amendment rights, we do not think he has raised considerations that would change our analysis by triggering the more exacting, strict scrutiny standard that is applied to content-based regulations. *See, e.g., Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). The sole intention of the order of involuntary medication is to restore Gomes to competence for trial, not to "proscribe speech or even expressive conduct because of disapproval of the ideas

expressed." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citations omitted). In doing so, the administration of antipsychotics is intended to facilitate Gomes's ability "to produce and communicate ideas" and in this sense "positively *promote*[s] First Amendment interests by enhancing [his] ability to concentrate, read, learn, and communicate" and "clear[ing] the hallucinations and delusions produced by psychosis." Am. Psychiatric Ass'n at 22 (emphasis in original). In any event, under the circumstances of this case at least, a content-neutral regulation such as the instant order of involuntary medication would trigger only an intermediate scrutiny standard similar to the heightened scrutiny standard adopted today. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (applying an intermediate scrutiny standard to content-neutral time, place, and manner restrictions); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (applying a similar standard of intermediate scrutiny to a regulation limiting expressive conduct where the government interest was "unrelated to the suppression of free expression"). Thus the standard we hold to be appropriate provides adequate protection of Gomes's First Amendment rights.

## IV. Application of the Standard

We agree with Gomes that the district court's thirteen-factor test was needlessly cumbersome. Although the district court's analysis was thorough and thoughtful, it did not discuss in sufficient depth the more limited number of factors identified by the test we adopt. In particular, the district court did not adequately consider Gomes's liberty interest, the possible limits of the government's interest in prosecution, and the need for monitoring of Gomes's condition. For this reason, and because of the passage of time since the district court hearing, we vacate that part of the district court's order that authorizes the involuntary medication of Gomes and remand for an involuntary medication hearing that is consistent with the standard we are announcing.

To assist the district court, we will briefly discuss the record facts of this case, understanding that they may be modified or supplemented with additional evidence on remand, in light of the applicable standard.

### A. The Government's Interest in Prosecuting Gomes

With respect to the inquiry into the government's interest in trying the defendant, we decline to set forth a bright-line rule for all cases. While the governmental interest will generally be essential, it is still case specific. The factors that bear on this interest include whether the crime is one that is broadly harmful, such as drug trafficking, *see United States v. Arena,* No. 00 CR.398, 2001 WL 1335008, at *3 (S.D.N.Y. Oct.30, 2001)(finding that there is a compelling governmental interest in bringing to trial a defendant charged with conspiring to import cocaine), or a scheme of health care fraud, *see Sell,* 282 F.3d at 568 & n. 8 (deeming to be "paramount" the government's interest in prosecuting criminal charges of health care fraud and money laundering); whether it is classified as a felony and carries a substantial penalty, *see Weston,* 255 F.3d at 881 (noting that the statutory sentences for crimes "reflect the intensity of the government's interest in bringing those suspected of such crimes to trial"); and whether the defendant poses a danger to society, based on the charged conduct, his past conduct, or both.

In this case, we believe that the government has an essential interest in bringing Gomes to trial. Gomes faces trial for a serious felony—possessing a firearm as a felon. Both the seriousness of the crime and Gomes's perceived dangerousness to society are evident from the substantial sentence Gomes faces if convicted. Because he has committed at least three prior violent felonies or serious drug offenses, Gomes faces a possible statutory minimum of fifteen years' imprisonment. Of course, statutory maxima and minima, while helpful indicators of the general governmental interest in prosecuting such a crime, may overstate or understate the severity of the actual charged conduct and the particular risk to society posed by the defendant. It is appropriate for the district court to consider the sentence likely to be imposed in fact rather than the statutory maximum alone.

Some other aspects of the district court's consideration of the interests implicated in this case warrant further discussion. First, to the extent that the district court considered the enforcement of the federal criminal laws generally to be an essential overriding justification for involuntary medication, we think that it swept with too broad a brush. While the government has a strong interest in prosecuting all crime, some prosecutions are simply so minor that, in the absence of some unusual compelling reason, they ordinarily will not outweigh a defendant's interests in avoiding involuntary medication. We will not provide a definitive list of such offenses, but we have in mind such crimes as the first-time theft of a single letter or unlawful possession of a small amount of drugs for personal use. In appropriate circumstances—depending on the dangerousness of the defendant—there might be exceptions even in these cases.

In addition, the defendant's liberty interest, a critical factor in any proper analysis, is absent from the district court's discussion. We are not satisfied by the government's claim that the court implicitly considered Gomes's liberty interest when it said it weighed the competing interests. The analysis of whether to involuntarily medicate must consider—and discuss explicitly—the defendant's liberty interest.

## B. The Medical Appropriateness of Gomes's Proposed Treatment

As part of its inquiry into the medical appropriateness of administering antipsychotic medication in Gomes's case, the district court appropriately considered the expert's diagnosis of the defendant's mental illness. *See Weston*, 255 F.3d at 876 ("Whether a proposed course of action is 'medically appropriate' obviously depends on the judgment of medical professionals.") (collecting cases); *Harper*, 494 U.S. at 231, 110 S.Ct. 1028. The government offered the testimony of Gomes's treating psychiatrist at USMC-Springfield, Dr. Wolfson, who testified extensively about the likely effects and side effects of both the older and newer types of antipsychotic medication. Weighing the benefits of this type of medication against the possible harms, Dr. Wolfson concluded that medication was appropriate for Gomes. Without faulting Dr. Wolfson's comprehensive and competent testimony, we believe that, given the passage of time, the district court on remand should update the testimony, particularly to account for possible developments in Gomes's condition and advances in appropriate medications and their side effects.

## C. The Necessity of Medicating Gomes Because of the Absence of Less Invasive Means of Restoring Him to Competency

The required inquiry into the necessity of administering the drugs addresses two

important concerns. First, it accomplishes narrow tailoring in that it requires the government to make a showing that it "could not obtain an adjudication of [defendant's] guilt or innocence by using less intrusive means." *Riggins,* 504 U.S. at 135, 112 S.Ct. 1810; *see also Sell,* 282 F.3d at 567; *Weston,* 255 F.3d at 882. Second, it ensures that, before medication is ordered, the district court finds that the prescribed medicine is likely to restore the defendant to competency. *See Sell,* 282 F.3d at 567.

 The necessity requirement should not be applied myopically. As the *Weston* court noted, "[e]ven narrow tailoring in strict scrutiny analysis does not contemplate a perfect correspondence between the means chosen to accomplish a compelling governmental interest." 255 F.3d at 883. The district court need only find that it is sufficiently likely, in light of the importance of the government's interest in prosecution, that the medication will restore the defendant to competence and will not produce undue side effects; it need not find that the medication is absolutely certain to have the desired effect. *See Sell,* 282 F.3d at 570. In this connection, we do not foreclose the possibility that, even though the alternative of psychiatric therapy might be determined to be ineffective standing alone, such treatment in conjunction with medication could possibly be effective and appropriate in particular circumstances.

### D. The Continued Monitoring of Gomes

 Although the district court did order that Gomes be monitored for side effects, we find that its order was insufficiently specific with respect to the need for continued monitoring of Gomes's ability to participate in and receive the fair trial that we believe is both feasible and warranted.

It is essential that not only Gomes's health, but also his ability to participate in his trial, be evaluated over the course of the trial when the actual effects of the medication are known. *See id.* at 572.

### E. The Insanity Defense

 Finally, because the medication is likely to enhance Gomes's ability to rationally communicate, it would not, as Gomes's counsel contends, unduly prevent him from raising an insanity defense. "[A] defendant does not have an absolute right to replicate on the witness stand his mental state at the time of the crime." *Weston,* 255 F.3d at 884. The need for medication to render Gomes competent continues to yield an argument of some force that but for the medication, his illness would amount to insanity and that he suffered from the same illness when the crime was committed. In short, Gomes remains free to present an insanity defense through the testimony and reports of the doctors who have treated him or examined his file.

## V. Gomes's Remaining Claims

 The other issues presented by this appeal are easily disposed of without extended discussion. There is no merit to Gomes's claim that the Bill of Rights for Mental Health Patients, 42 U.S.C. § 9501, and the Restatement of the Bill of Rights for Mental Health Patients, 42 U.S.C. §§ 10841, *et seq.,* prohibit involuntary medication. The plain language of these statutes expressly exempt treatment "permitted under applicable law in the case of a person committed by a court to a treatment program or facility," 42 U.S.C. §§ 9501(1)(D)(ii) & 10841(1)(D)(ii), and in any event their prescriptions are only precatory and directed to the states, *id.* §§ 9501 & 10841. With respect to the appointment of a guardian *ad litem* to represent Gomes's medical interests, we

agree with *Weston* that such an appointment is unnecessary. 255 F.3d at 887.

## CONCLUSION

For the foregoing reasons, we vacate that part of the district court order authorizing Gomes's involuntary medication and remand the case for further proceedings consistent with this opinion.