**UNITED STATES of America**

v.

**Aaron GOMES a/k/a "Lamont Keaton"**

**No. CRIM. 3:98 CR 195(CF).**

United States District Court,
D. Connecticut.

Feb. 17, 2004.

---

John A. Danaher, III, Thomas V. Daily, Hartford, CT, for USA.

Jeremiah F. Donovan, Old Saybrook, CT, for Aaron Gomes.

## RULING AND ORDER RE: INVOLUNTARY MEDICATION

DRONEY, District Judge.

Pending before the Court is the government's request to medicate the defendant involuntarily as part of his court-ordered treatment under 18 U.S.C. § 4241(d)(2)(A). The request is GRANTED as follows.

## I. BACKGROUND

On October 27, 1998, the defendant was indicted by a federal grand jury on one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The indictment arose from defendant's arrest in the early morning hours of September 30, 1998, by the Hartford Police on state charges related to possession of a .25 caliber semi-automatic handgun and a quantity of suspected narcotics.

On December 23, 1998, the defendant filed a motion to suppress. On April 16, 1999, the district court, following an evidentiary hearing, denied the defendant's motion. On May 6, 1999, the United States filed a notice of sentence enhancement under the Armed Career Criminal Act, advising the Court that, because the defendant has at least three previous convictions of violent felonies or serious drug offenses, the defendant faced a mandatory minimum sentence of 15 years imprisonment pursuant to 18 U.S.C. § 924(e).

On June 23, 1999, the district court entered an order for the defendant to be examined by a psychiatrist in Connecticut and thereafter for a competency hearing to be held. The defendant refused to cooperate with the psychiatrist appointed by the Court to conduct the examination. Accordingly, on October 25, 1999, the Court entered an order pursuant to 18 U.S.C. § 4241(b), committing the defendant to the custody of the Attorney General for 30 days to be placed in a suitable psychiatric facility for examination and report. The defendant was committed to the custody of the Bureau of Prisons and transferred to the Bureau of Prisons Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP–Springfield").

On May 12, 2000, after receipt of the examination report indicating that the defendant was not competent to stand trial, the district court conducted a competency hearing. By written order dated June 7, 2000, the Court concluded that the defendant was not competent to stand trial and ordered the defendant committed to the custody of the Attorney General for a period of three months, pursuant to 18 U.S.C. § 4241(d)(1), for the purpose of determining whether there is a substantial possibility that in the then foreseeable future he would attain the capacity to proceed to trial. The defendant appealed the June 7,

2000 order to the U.S. Court of Appeals for the Second Circuit, which ordered an expedited appeal and then affirmed the decision of the district court by a summary order dated October 2, 2000.

Pursuant to the district court's June 7, 2000 order, the defendant was returned to MCFP–Springfield for evaluation and treatment. After the defendant refused prescribed treatment with anti-psychotic medication, an administrative involuntary medication hearing was held at MCFP–Springfield pursuant to 28 C.F.R. § 549.43. Involuntary medication of the defendant was ordered.

On October 13, 2000, the Government requested that the district court supplement its order of June 7, 2000 to expressly authorize the Bureau of Prisons to involuntarily medicate the defendant based upon the administrative order. The Court denied the request and ordered that a judicial evidentiary hearing be conducted on the issue of involuntary medication of the defendant.

On December 28, 2000, the Court conducted an involuntary medication hearing at which a MCFP–Springfield psychiatrist and the defendant testified. By written order dated February 6, 2001, the Court concluded that the defendant may be involuntarily medicated for the purpose of restoring him to competency, subject to certain conditions.

On February 20, 2001, the defendant appealed the medication order. On motion of the defendant's counsel, with the consent of the Government, the Second Circuit expedited the appeal. The district court granted the defendant's motion to stay the medication order.

On April 24, 2002, the Second Circuit, announcing a standard under which involuntary medication may be ordered to render a non-dangerous criminal defendant competent to stand trial, vacated the district court's Order of involuntary medication and remanded the case for further proceedings consistent with its opinion. The defendant filed a Petition for Writ of Certiorari, seeking review of the Second Circuit's opinion to the United States Supreme Court. The Supreme Court stayed the Petition for Writ of Certiorari, pending consideration of the case of *Sell v. United States*, where certiorari was granted in a case from the Eighth Circuit, also addressing the question whether the Government may administer anti-psychotic drugs involuntarily to a mentally ill criminal defendant in order to render that defendant competent to stand trial. The district court continued its stay of the Order permitting involuntary medication.

On June 16, 2003, the Supreme Court rendered its opinion in *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), holding that the Government may involuntarily administer anti-psychotic drugs to a mentally ill defendant to render that defendant competent to stand trial under certain circumstances. On June 23, 2003, the Supreme Court granted defendant's petition for Writ of Certiorari and vacated the judgment of the Second Circuit and remanded to the Second Circuit for further consideration in light of the Court's decision in *Sell*. *Gomes v. United States*, —— U.S. ——, 123 S.Ct. 2605, 156 L.Ed.2d 625 (2003). On July 11, 2003, the Second Circuit ordered the case remanded to this Court for reconsideration and application of the standards for involuntary medication to render a defendant competent to stand trial set forth in *Sell*. *United States v. Gomes*, 69 Fed.Appx. 36, 2003 WL 21655278 (2d Cir.2003).

On July 23, 2003, the Court ordered that the defendant be transferred to the MCFP–Springfield for 30 days for evaluation of his present competence to stand

trial and assist in his defense, the likelihood that in the foreseeable future he will attain the capacity to proceed to trial, the proposed course of treatment to attain that capacity, and the factors set forth by the Supreme Court in *Sell.* Pursuant to the Order and after evaluation, doctors at MCFP–Springfield forwarded to the Court a forensic mental health evaluation, dated September 12, 2003.

On October 7, 2003, the Court conducted an involuntary medication hearing, at which Dr. David F. Mrad and Dr. Robert G. Sarrazin, staff psychologist and staff psychiatrist at MCFP Springfield, respectively, testified.

## II. DISCUSSION

### A. Standard for Involuntary Medication

■ An individual has a constitutionally protected liberty interest in rejecting medical treatment. *See Washington v. Harper,* 494 U.S. 210, 211, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (recognizing "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Riggins v. Nevada,* 504 U.S. 127, 134, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (repeating that there is a constitutionally protected "interest in avoiding involuntary administration of antipsychotic drugs"). However, in *Sell v. United States,* the Supreme Court held:

the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives is necessary significant-

ly to further important governmental trial-related interests.

539 U.S. 166, 123 S.Ct. 2174, 2184, 156 L.Ed.2d 197 (2003).

■ The Court indicated that this standard implies the following factors: (1) that important governmental interests are at stake; (2) that involuntary medication will significantly further those concomitant state interests; (3) that involuntary medication is necessary to further those state interests; and (4) that administrations of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition. *Id.* at 2184–85. The Supreme Court, however, did not appear to address by what standard the Government must establish the preceding factors. Under the same rationale as discussed in the February 6, 2001 ruling, this Court concludes that the proper standard is "by clear and convincing evidence." Thus, this Court must find that the preceding *Sell* factors were established by clear and convincing evidence.

In addition to setting forth the standard, the Supreme Court also directed trial courts, when faced with this issue, to determine whether forced medication may be warranted for a purpose other than returning a defendant to competence to stand trial, such as "the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." *Id.* at 2185.

Additionally, the Supreme Court advised the Government to proceed with its evaluation and request for involuntary medication based upon current information. "The Government may pursue its request for forced medication on the grounds discussed in this opinion, including grounds related to the danger [the defendant] poses to himself or others. Since [the defendant's] medical condition may have

changed over time, the Government should do so on the basis of current circumstances." *Id.* at 2187.

The Court makes the following findings of fact and conclusions of law:

### B. Defendant's Current Competency To Stand Trial

Dr. Mrad, staff psychologist at MCFP–Springfield, evaluated Gomes during his most recent evaluation from August 7 to September 5, 2003.[1] Dr. Mrad had also participated in Gomes's prior evaluations at MCFP–Springfield. This most recent evaluation was also conducted by Dr. Sarrazin. Dr. Mrad's current diagnosis of the defendant is "delusional disorder with grandiose and persecutory type." The basis of the opinion is that the defendant continues to display, verbalize and believe a set of delusions or false fixed beliefs about the criminal justice system, about the district court and about a Connecticut state judge being involved in a conspiracy against him. The delusion has a persecutory component in that Gomes believes that efforts are being made to manipulate what happens to him in the prison system and the court system. His delusion also has a "grandiose component" to it involving statements that the courts "had never seen someone like him or who knows as much as he does," and that he is going to be represented by a "famous and powerful attorney" in this case.

Dr. Mrad's most recent diagnosis is more specific than his 1999 evaluation of Gomes. Dr. Mrad noted that the defendant's condition during his most recent evaluation differs from his condition in 1999. For example, there was less hostility and more cooperation during the most re-

cent evaluation. He was also willing to interact some with other inmates.

Notwithstanding, Dr. Mrad testified that it was his opinion as part of his most recent evaluation that Gomes is still not currently competent to stand trial. The basis of his opinion is that Gomes continues to verbalize delusional ideas specifically related to his case and the prosecution against him. Given that those beliefs are fixed and consistent over time, Dr. Mrad opined that the defendant is not rationally able to assist in his defense and that he views the case in light of his delusional and irrational ideas about the prosecution. Dr. Mrad also believes that the defendant is not making decisions based upon rational thinking. Dr. Sarrazin concurred in the defendant's diagnosis as delusional disorder, grandiose and persecutory type. He also testified that the defendant is not currently competent to stand trial because of his persecutory delusions rendering him unable to rationally consult with his attorney and to assist in his defense.

 The Court accepts Drs. Mrad and Sarrazin's opinions as set forth in their September 12, 2003 report and October 7, 2003 testimony, and finds that Gomes is still not competent to stand trial.

### C. Sell Factors

### 1. Important Government Interests At Stake

The first prong of the *Sell* test requires trial courts to "find that *important* governmental interests are at stake." 123 S.Ct. at 2184. In this case, the Government's interests in the prosecution of Mr. Gomes for a serious firearms offense are substantial. He faces a mandatory minimum term of incarceration if convicted as an Armed

---

1. *See* Government's Exhibit 2. Dr. Mrad and Dr. Sarrazin are the authors of the September 12, 2003 report provided to the Court, rendering opinions consistent with their testimony on October 7, 2003.

Career Criminal of 15 years, pursuant to 18 U.S.C. § 924(e). As was noted by the Second Circuit in its opinion regarding involuntary medication in this case:

> [W]e believe that the Government has an essential interest in bringing Gomes to trial. Gomes faces trial for a serious felony— possessing a firearm as a felon. Both the seriousness of the crime and Gomes' perceived dangerousness to society are evident from the substantial sentence Gomes faces if convicted. Because he has committed at least three prior violent felonies or serious drug offenses, Gomes faces a possible statutory minimum of 15 years imprisonment.

*United States v. Gomes*, 289 F.3d 71, 86 (2d Cir.2002) (vacated and remanded for further consideration in light of *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003)). Nothing in the *Sell* opinion would contradict this finding as to the seriousness of the offense itself.

Additionally, the actual sentence that Gomes faces is greater than the statutory mandatory minimum of 15 years. As an Armed Career Criminal, Gomes would be sentenced pursuant to the provisions of U.S.S.G. § 4B1.4. Gomes is accused of possessing the firearm in connection with a controlled substance offense, therefore, pursuant to subsection (b)(3)(A), his offense level would likely be 34 and, pursuant to subsection (c)(2), his criminal history category would likely be category VI. An offense level 34 and criminal history category IV yields a sentencing guideline range of 262 to 327 months imprisonment.

Furthermore, the specific facts of this case, as presented in detail at the hearing on the Defendant's Motion to Suppress, and as found by the Court in its ruling denying the motion, indicate a compelling Government interest, in that Gomes allegedly possessed the firearm while selling drugs in a violent part of the City of Hartford. *See* Ruling on Defendant's Motion to Suppress at 2–4. *But see United States v. Dumeny*, 295 F.Supp.2d 131 (D.Me.2004) (Government has insufficient interest to warrant an order to involuntarily medicate defendant charged with possession of firearms by a person previously committed to a mental health institute, where defendant not charged with improper use of the firearms).

In *Sell*, in determining the importance of the Government interest, the Supreme Court instructed that the district courts should consider whether the failure of the defendant to take drugs voluntarily would mean a lengthy commitment in an institution for the mentally ill, which "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." 123 S.Ct. at 2184. "The potential for future confinement affects, but it does not totally undermine, the strength of the need for prosecution." *Id.*

In that regard, Dr. Mrad testified to the procedure that would take place at the Bureau of Prisons if the defendant were not restored to competence. The defendant would be subject to the provisions of 18 U.S.C. § 4246 to determine whether he should be subject to civil commitment, and to determine whether the defendant, if released to the community, would pose a substantial risk to the persons or property of others. However, Dr. Mrad testified that he has not made that judgment, but both Drs. Mrad and Sarrazin testified that the defendant was not a danger in the prison environment.

Apart from the procedures that would apply to Gomes in the context of civil commitment, it would seem important under *Sell* to consider whether the diagnosis of Drs. Mrad and Sarazin would likely result in Gomes's civil commitment. Al-

though it is almost impossible to predict the outcome of civil commitment proceedings in many cases, here it is especially problematic in that the disorders diagnosed in this case relate specifically to the competency determination and not to his risk of harming other persons or property. Perhaps some competency evaluations may be good predictors of the outcomes of civil commitment proceedings, but the evaluations here are of little help. In addition, the length of Gomes's sentence if he is convicted is relevant to this consideration. The mandatory minimum of fifteen years and the likely guideline range of 262–327 months imprisonment could very well be longer than any period of civil commitment. Thus, this part of the *Sell* analysis would seem to be of little value in determining (or lessening) the important governmental interests as to Gomes.

■ The Supreme Court in *Sell* also directed the trial court to consider how long a defendant has been detained pretrial. 123 S.Ct. at 2184. Here, although Gomes has been confined pretrial for over five years, he faces a mandatory minimum 15–year sentence and a likely sentence of 262 to 327 months. On balance, because of the seriousness of the offense and the substantial sentence the defendant faces, there exists an important governmental interest in bringing Gomes to trial.

### 2. Involuntary Medication Will Significantly Further The State Interests In Bringing The Defendant To Trial

The first part of the second prong of the *Sell* test requires district courts to "find that administration of the drugs is substantially likely to render the defendant competent to stand trial." 123 S.Ct. at 2184. Drs. Mrad and Sarrazin testified that the appropriate treatment to restore Gomes to competence was treatment with anti-psychotic medications. The experience of the Bureau of Prisons in treating defendants with psychotic disorders similar to Gomes's is at least a 70 percent rate of success in restoring defendants to competence when they are treated with these medications, even when treated involuntarily. It was also their opinion that there was a substantial possibility that Gomes would be restored to competence with treatment of atypical anti-psychotic medications.

Dr. Sarrazin testified that he would attempt to treat Gomes with "atypical" antipsychotics that have been developed over the last five to eight years. Specifically, he would attempt to treat Gomes with the following atypicals: Risperidone, Quetiapine, Ziprasidone, Aripiprazole, and Olanzapin. "Typical" anti-psychotic medications include Halperidol, Fluphenazine, and Thiothizene.

The atypical anti-psychotics are designed and help with treating psychosis, delusions, and hallucinations. Dr. Sarrazin specifically testified that these medications help with delusions so that they are not as prominent, and patients not as preoccupied with them. He testified that as to Gomes, the atypicals will help reduce his preoccupation with his delusions. The medications may also help end the delusions completely or cause the delusions to fade into the background where they are not as prominent. After receiving antipsychotics, patients are also often able to better interact with others and be more socially and occupationally successful in the community setting. Dr. Sarrazin indicated that the objective in treating Gomes with anti-psychotic medication would be to make his delusions less prominent and permit him to better address his case and his defense.

It has been Dr. Sarrazin's experience that treatment with atypical anti-psychotic medication has improved psychotic disor-

ders and the individual's functioning, and ability to relate to others. Dr. Sarrazin opined that treatment with psychotic medications would treat Gomes's delusional disorder, and lessen the extent to which the persecutory delusions have on his functioning. In addition, the anti-psychotic medication would enhance Gomes's ability to communicate and discuss trial strategies with his attorney.

The second prong of the *Sell* test also requires district courts to "find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." 123 S.Ct. at 2184–85. Dr. Sarrazin testified at length in regard to the possible side effects of medication with anti-psychotics.

Dr. Sarrazin testified that atypicals produce less side effects than may occur with the older, typical anti-psychotics. Those side effects include neuroleptic malignant syndrome,[2] tardive dyskinesia,[3] and extrapyramidal side effects such as patients feeling like their feet have to keep moving (akathisia), dryness of the mouth, constipation and urinary difficulties. These side effects may also occur with atypical antipsychotics, but are must less likely to occur.

Dr. Sarrazin testified that the possible side effects of atypical anti-psychotic medications include sedation, dryness of the mouth, problems with gastrointestinal abdominal complaints, diarrhea and constipation. He indicated that very rarely are there problems with extra-pyramidal side effects, such as stiffness. Extra-pyramidal side effects are much less common with atypicals and almost non-existent throughout the dosage range that doctors use for treatment purposes. Dr. Sarrazin also indicated that there is a much lower risk of tardive dyskinesia as a result of treatment with atypicals than with typicals. In addition, Dr. Sarrazin testified that nuisance side effects, such as dryness of the mouth, often resolve over three to four days of use of the medication and are dosage related. Doctors are able to eliminate those side effects by changing the dose of the medications.

Dr. Sarrazin testified that with anti-psychotic medication treatment at an appropriate dose and established over a period of dosage escalation, any side effects should have minimal, if no, impact on an individual's ability to participate in a trial and consult with his attorney. Doctors treat with medication in order to improve a patient's functioning, his ability to relate to others, and his functional abilities. The treaters select medications to avoid sedation and improve the patient's cognitive ability. Dr. Sarrazin's experience is that any sedation effect of the medications is time-limited and dose-related. The sedation effects vary from person to person and can be treated by dose and timing of dose.

One atypical medication, Ziprasidone, is now available in a short-acting injectable intra-muscular form which can be given to a patient if he refuses to take medications orally. Dr. Sarrazin indicated that Gomes would be treated with oral atypical medications if he cooperated, such as Ziprasi-

---

2. Neuroleptic malignant syndrome concerns temperature regulation and muscle breakdown.

3. Tardive dyskinesia, which can be permanent, is the abnormal involuntary movements of the face and tongue and can occur with use of typical antipsychotics, but generally, only to patients who receive higher dosages over a longer period of time.

done or Risperidone. Risperidone and Olanzapine are also available in dissolvable tablets which permit the doctors to monitor whether someone is complying with oral medication because the tablets dissolve in his mouth. Dr. Sarrazin's protocol in treating patients with anti-psychotic medications who refuse to take oral medications is that he begins with the medications in injectable form and when patients become more compliant or cooperative, they agree to take the oral medications and to work with the doctors. Dr. Sarrazin testified that the standard of treatment is to begin with the atypicals. Dr. Sarrazin indicated that if Gomes refuses to take medications orally, Ziprasidone could be injected on a daily basis. However, there are situations where an individual does not cooperate even with the additional time with that medication and the doctors will then use the typical anti-psychotics, such as Fluphenzine or Halperidol, which come in a long-acting injection, allowing the medication to be effective for a two to three-week period. The patients are monitored as medications are given and an appropriate medication amount is determined so as to avoid as much as possible any detrimental side effects.

Dr. Sarrazin also testified in regard to possible side effects and monitoring after a patient is transferred to a location to stand trial. He noted that once a patient reaches a stable dosage of anti-psychotic medication treating his disorder and where his competence has been restored, he would usually not have further side effects. Those side effects previously would be resolved or addressed. The monitoring that would take place at that point would be compliance with medication; that is, to make sure that a patient continues to take the medication. It would be necessary to monitor the patient in the correctional center to check that the medication is taken.

After a patient has been treated and a medication selected, it would be uncommon that there would later be any detrimental side effects.

■ In conclusion, the planned treatment with anti-psychotic medications is substantially likely to render Gomes competent to stand trial. The anti-psychotics will make his delusions less prominent and enhance his ability to communicate with his attorney regarding his case and his defense. In addition, the side effects of the planned treatment with anti-psychotic medications, as testified to by Dr. Sarrazin, are substantially unlikely to interfere significantly with the defendant's ability to assist counsel in conducting a trial defense. In fact, Dr. Sarrazin opined that the treatment would help Gomes better assist in his trial defense. Any concern in regard to the side effects that might impact Gomes's ability at trial, namely sedation, would be dealt with in determining which and how much dose of anti-psychotic medication to prescribe. Dr. Sarrazin also indicated that once a treatment level of dosage was maintained, the only monitoring necessary would be to determine whether the defendant continued to take his medication. As noted above, medications are available in a form to more easily permit authorities to determine that the medication is taken. Under those circumstances, Dr. Sarrazin has indicated that side effects arising during trial is highly unlikely.

Thus, the Court concludes that involuntary medication will significantly further the state interests in bringing Gomes to a fair trial.

### 3. Involuntary Medication Is Necessary

The third prong of the *Sell* test requires trial courts to "find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." 123 S.Ct. at 2185.

Both Drs. Mrad and Dr. Sarrazin testified that other types of treatment would not be effective in restoring Gomes to competence. Dr. Mrad opined that verbal therapy would be unsuccessful in restoring Gomes to competence because the effect of Gomes's delusions is that Gomes does not believe he has a problem. Likewise, Dr. Sarrazin indicated that alternative treatment (less intrusive treatments such as therapy or individual group therapy) would not be effective in restoring Gomes to competence because of Gomes's lack of insight into his illness. In Dr. Sarrazin's opinion, treatment with anti-psychotic medication is necessary to restore Gomes to competence.

In addition, any court-imposed alternative to an order of medication, such as a court order to the defendant backed by the contempt power, is not likely to be successful here. *See Sell,* 123 S.Ct. at 2185. Gomes, throughout the course of this case, has indicated his intention to refuse to take anti-psychotic medication under any circumstance. A court order threatening contempt would be highly unlikely to change the defendant's view, and would only delay the court's decision on an order to the Bureau of Prisons to medicate the defendant. Additionally, it has been made clear through the testimony of all medical treaters that prior to forcibly medicating the defendant, they will request that he voluntarily take the medications, by oral method.

As the Court finds by clear and convincing evidence that any alternative, less intrusive means are unlikely to bring Gomes to competence, the Court concludes that involuntary medication is necessary to further the state interests in bringing Gomes to trial.

### 4. The Administration Of Anti–Psychotic Medication Is Medically Appropriate

The fourth prong of the *Sell* test requires trial courts to "conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." 123 S.Ct. at 2185.

As discussed above, both Dr. Mrad and Dr. Sarrazin testified that treatment with anti-psychotic medication is the medically appropriate treatment for Gomes. Both considered the benefits and potential side effects and concluded that, on balance, treatment with medications was the indicated course of treatment. As Dr. Sarrazin testified, "Mr. Gomes is suffering from a psychotic disorder, and his persecutory delusional disorder is such that [his] needs benefit from treatment of the anti-psychotics. It is medically appropriate to treat a debilitating illness and a dangerous illness . . . ." Tr. at 66.

Based on the September 12, 2003 report authored by Dr. Mrad and Dr. Sarrazin and the testimony of Drs. Mrad and Sarrazin on October 7, 2003, the Court concludes that administration of anti-psychotic medications is in Gomes's best medical interest in light of his psychotic disorder and his persecutory delusional disorder. The Court has considered the varying potential side effects and success rates of different kinds of anti-psychotic drugs and concludes that administration of the drugs is medically appropriate.[4]

### D. Whether Forced Medication Is Warranted For A Different Purpose

The Supreme Court in *Sell* also directed courts to determine whether there was

---

4. The Court declines to order a particular course of anti-psychotic drug treatment, as that is best determined by the treating doctors, following the approach set forth in this opinion.

some other basis upon which a defendant could be ordered medicated, such as to render an individual not dangerous. 123 S.Ct. at 2185 (citing *Washington v. Harper*, 494 U.S. 210, 225–26, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)). As earlier witnesses in this case have testified, and in the view of Dr. Mrad and Dr. Sarrazin as expressed at the hearing, Gomes is not dangerous in the prison population, so involuntary medication is not appropriate for that reason. Nor does the testimony here support involuntary medication for the reason that refusal to take drugs would put his health gravely at risk, thus permitting appointment of a guardian to make that decision.[5] The delusions reported by the doctors here only place Gomes at risk of not proceeding to trial, in that they have opined that Gomes is unable to assist in his defense given his delusions. There is no other interest "where refusal to take drugs puts his health gravely at risk" as identified by the Court in *Sell*, 123 S.Ct. at 2185. Because of the absence of any serious additional health risk to the defendant, other than the inability to adjudicate his pending criminal case, appointment of a conservator under Connecticut law to make medical decisions on his behalf is not appropriate. *See* Conn. Gen.Stat. §§ 45a–644 to 45a–663, 17a–543 (appointment where person has a mental condition resulting from illness which results in the person's inability to care for himself or mental health needs which result in endangerment to such person's health). Circumstances permitting treatment with anti-psychotic medications for those alternative purposes are not present here.

### III. CONCLUSION

█ Having considered the *Sell* factors and Mr. Gomes's current competency to stand trial, the Court concludes that Mr. Gomes may be involuntarily medicated. In light of the application of the *Sell* factors, including the efficacy, the side effects, the possible alternatives, and the medical appropriateness of anti-psychotic drug treatment, the Government has shown by clear and convincing evidence a need for drug treatment sufficiently important to overcome Mr. Gomes's liberty interest in refusing it.

The defendant shall be returned to the custody of the Bureau of Prisons for treatment to restore him to competence to proceed to trial, and may be involuntarily medicated to effect that purpose if the defendant does not voluntarily do so. The initial period for such treatment will be four months from the commencement of such treatment. That period may be extended upon court approval. The Court finds that there is a substantial probability that in the foreseeable future Gomes will attain the capacity to permit the trial to proceed. After the medications have been administered and Mr. Gomes has been restored to competency, a report shall be filed with the Court regarding the results of the treatment of Mr. Gomes, how the medications will affect Mr. Gomes at trial, and how to closely monitor the effects of the medication throughout the trial. The Government shall also file monthly reports with the Court during the treatment period.

---

**5.** As the Court found *above*, however, the course of treatment indicated here is medical- ly appropriate for Gomes.